**Bruce F. KUPKA, individually and as next friend of Lara M. Kupka; Lara M. Kupka, an infant, By and Through Bruce F. Kupka, her next friend; and Patricia A. Kupka, Plaintiffs,**

v.

**GNP COMMODITIES, INC.; Paul Gelman; and Sharon J. Gelman, Defendants.**

Civ. A. No. 85–2111.

United States District Court, D. Kansas.

March 24, 1986.

On Motion for Reconsideration June 5, 1986.

Theodore C. Beckett, Don R. Lolli, Emmett J. McMahon, Beckett & Steinkamp, Kansas City, Mo., Charles C. Rankin, Lawrence, Kan., for plaintiffs.

Jerrold E. Salzman, Phillip L. Stern, Richard S. Davis, Freeman, Freeman & Salzman, Chicago, Ill., James L. Crabtree, Overland Park, Kan., for defendants.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter comes before the court on defendants' motion for partial summary judgment. *See* Fed.R.Civ.P. 56(d). The matters on which defendants seek the entry of summary judgment are as follows:

(1) The liability of defendant Sharon Gelman ("Mrs. Gelman");

(2) All three defendants' liability on plaintiffs' claim for outrage;

(3) The liability of defendant Paul Gelman ("Mr. Gelman") for punitive damages; and

(4) The liability of defendant GNP Commodities, Inc., ("GNP") for punitive damages.

Entry of summary judgment as to any matter is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering such a motion, we must examine all evidence in the light most favorable to the opposing party. *Prochaska v. Marcoux*, 632 F.2d 848, 850 (10th Cir.1980), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 841 (1981). Where differing inferences could reasonably be drawn from conflicting affidavits and depositions, summary judgment should be denied. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, when the movant has properly supported his motion, the opponent's response must, by affidavits or otherwise, set forth specific facts showing that there is a genuine issue for trial. "If he does not so respond, summary judgment, if appropriate, shall be entered against him." Fed.R. Civ.P. 56(e). In any event, the Tenth Circuit requires a moving party to demonstrate his entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985).

Resolving all factual disputes in favor of plaintiffs, the facts material to the disposition of this motion are as follows. Throughout the relevant time period, Mr. and Mrs. Gelman were both employed by GNP. Mrs. Gelman's primary duty was to solicit new clients for her immediate supervisor, Mr. Norman Furlett. Although Mr. Furlett and Mr. Gelman were both brokers for GNP, Mr. Furlett was Mr. Gelman's supervisor. While Mr. Gelman would manage accounts as small as $5,000.00, Mr. Furlett would manage no account smaller than $10,000.00.

Around October 1, 1984, Mrs. Gelman telephoned the plaintiffs' residence and asked to speak with plaintiff Bruce F. Kupka ["Mr. Kupka"]. Plaintiff Patricia A. Kupka ["Mrs. Kupka"] answered the telephone and informed Mrs. Gelman that her husband was not then at home. Mrs. Gelman indicated that she wished to speak with Mr. Kupka regarding his possible investment in the commodities markets, and Mrs. Kupka suggested she call again later when Mr. Kupka would be at home.

Mrs. Gelman did call again, and this time she spoke with Mr. Kupka. During this conversation the two discussed Mr. Kupka's possible investment in the commodities markets, but Mrs. Gelman made no representations as to the long-term security of such an investment. Mr. Kupka indicated that he would like to speak with a broker

concerning his possible investment in commodities, and Mrs. Gelman agreed to send various items of written information to Mr. Kupka.

Because Mr. Furlett handled accounts of only $10,000.00 or more, and because Mr. Kupka indicated that he would be willing to invest only $5,000.00, Mr. Furlett suggested to Mrs. Gelman that she refer Mr. Kupka's inquiries to Mr. Gelman. Although Mrs. Gelman did not regularly solicit clients for her husband, she did receive fifty percent of any commissions he earned from clients solicited by her.

Shortly thereafter, Mrs. Gelman did send the written information to Mr. Kupka. Among these written matters were a "GNP Risk Disclosure Statement" (containing language mandated by the Commodity Futures Trading Commission [CFTC]), a "GNP Agreement for Controlled, Managed or Discretionary Account," and various account opening forms. These were sent with a form cover letter signed by Mrs. Gelman informing the plaintiffs how to go about opening an account with GNP. Also included in this mailing was Mrs. Gelman's business card, on which her title was listed as "Senior Account Executive." Apparently from this cover letter and business card, Mr. Kupka "understood" that Mr. and Mrs. Gelman were acting in concert. This was Mrs. Gelman's last contact with the plaintiffs.

On October 6, 1984, Mr. Gelman telephoned Mr. Kupka regarding Mr. Kupka's possible investment in the commodities markets. Mr. Kupka informed Mr. Gelman that he earned approximately $35,000.00 a year as a TWA flight attendant and that he had just received an insurance settlement. Of that insurance settlement, Mr. Kupka planned to give $5,000.00 to his daughter, Lara, for her college fund. He wished to invest that $5,000.00 in a secure investment with a steady source of income. Mr. Gelman indicated that an investment in the commodities markets would be suitable for that purpose and that he would manage any such invested monies in good faith and in the plaintiffs' best interest. Mr. Gelman

concealed from Mr. Kupka any intent to "churn" Mr. Kupka's account or to place his own interests ahead of Mr. Kupka's. These alleged misrepresentations and concealments form the basis for Counts I and II, which state claims for fraudulent misrepresentation and fraudulent concealment, respectively.

On the other hand, Mr. Kupka concedes that Mr. Gelman told him that investing in the commodities markets was "not for widows and orphans" and could conceivably result in the loss of Mr. Kupka's entire $5,000.00 investment. Similar cautionary statements were contained in the Risk Disclosure Statement mailed to Mr. Kupka earlier, and Mr. Gelman never told Mr. Kupka to disregard those written warnings. As this conversation ended, Mr. Kupka indicated an interest in investing with GNP, but he asked Mr. Gelman to call him back in about two weeks so he could finish reading the written materials.

On October 15, 1984, Mr. Gelman placed a second telephone call to Mr. Kupka. During this call, Mr. Kupka agreed to invest $5,000.00 with GNP in the name of his daughter, Lara. Because Mr. Kupka's occupation as a flight attendant required him to be away from home a great deal of time, he told Mr. Gelman to trade the account in the plaintiffs' best interest and to call Mr. Kupka periodically to bring him up to date. However, neither Mr. Kupka nor his daughter Lara ever signed and returned the GNP Agreement for Controlled, Managed or Discretionary Account. This document would have formalized the agreement whereby Mr. Gelman was to utilize his own discretion in trading the plaintiffs' account.

Shortly thereafter, the account was opened and Mr. Gelman began to make commodities trades. After three days of trading, Mr. Gelman telephoned the plaintiffs' residence and spoke with Mrs. Kupka. He informed her that the trades executed up to that time had produced nearly $700.00 in profits for the account. During the next week, however, all but $104.77 of the plaintiffs' account was consumed in

losses and commissions. On November 2, 1984, Mr. Gelman telephoned Mr. Kupka and informed him of this unfortunate result. Five days later, Mr. Gelman mailed to the plaintiffs a check for this remaining amount.

In thirteen days of trading for Mr. Kupka's account, Mr. Gelman executed twenty-four trades. The total commission earned on these trades was $2,888.48, well over half of the initial $5,000.00 investment. Mr. Gelman's handling of this account forms the basis for Counts III and IV of the complaint, which state claims for churning and breach of fiduciary duty, respectively. Count V of the complaint, a claim for the intentional infliction of emotional distress (the tort of outrage), is apparently based on all of the matters discussed above.

Plaintiffs seek to hold GNP liable not only vicariously (*i.e.*, as the employer of the other two defendants), but also directly. The following facts are material to this claim of direct liability on the part of GNP. Upon Mrs. Gelman's employment, GNP agreed to indemnify her for any liability she might incur out of trading losses and improprieties sustained by customers she might solicit for GNP. Moreover, Mr. Gelman's supervisor (Mr. Furlett) failed to prevent Mr. Gelman from engaging in his alleged churning of Mr. Kupka's account. Finally, GNP failed to discipline the other defendants for their alleged wrongdoing.

On the other hand, because the plaintiffs failed to inform GNP of their displeasure with the Gelmans prior to the filing of this lawsuit, GNP had no opportunity to investigate these charges. Before hiring the Gelmans, GNP did inquire of their former employers and the CFTC. They reported no prior claims against the Gelmans, and, aside from this suit, no such claim has been made since the Gelmans joined GNP. Other than the Gelmans, no employee of GNP has had any contact with the plaintiffs.

## I. *Liability of Mrs. Gelman.*

■ We see no basis on which Mrs. Gelman may be held liable for any of the actions alleged in the complaint. Plaintiffs have failed to present any evidence that Mrs. Gelman executed any trades in the plaintiffs' account or made any material misrepresentations of fact. The fact that she is married to Mr. Gelman is no evidence that she had advance knowledge that Mr. Gelman would churn plaintiffs' account. Thus there is no evidence of fraudulent concealment. Mr. Kupka's "understanding" that the Gelmans were acting in concert is wholly unsupported by admissible evidence and thus must give way to the Gelmans' sworn affidavits that Mrs. Gelman's only role was solicitation of the account. Neither that solicitation nor her entitlement to a share of all future commissions permits an inference that she committed fraud or breached a fiduciary duty to the plaintiffs. We must thus grant defendants' motion for partial summary judgment as to the liability of Mrs. Gelman.

## II. *Liability on Outrage Claim.*

■ The Kansas courts have held that one responsible for the "intentional infliction of mental distress" may be held liable under the tort of outrage. *Roberts v. Saylor*, 230 Kan. 289, 292, 637 P.2d 1175, 1179 (1981). Proof of the following four elements is required to establish a cause of action for outrage:

(1) the conduct of defendant must be intentional or in reckless disregard of plaintiff;

(2) the conduct must be extreme and outrageous;

(3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and

(4) plaintiff's mental distress must be extreme and severe.

*Id.* The *Roberts* court went on to note, however, certain restrictions on the ability to maintain a claim for outrage:

Liability for extreme emotional distress has two threshold requirements which must be met and which the court must, in the first instance, determine: (1) Whether the defendant's conduct may

reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it....

....

In the first instance the court must determine if these threshold requirements have been met. If the court determines from the pleadings, stipulations, admissions, and deposition of the plaintiff that reasonable fact finders might differ as to whether defendant's conduct was sufficiently extreme and outrageous as to subject him to liability for emotional distress, and if the court further determines plaintiff's emotional distress was such that reasonable fact finders might differ as to whether plaintiff's emotional distress was genuine and so severe and extreme as to result in liability, *then and only then,* it must be left to the jury to determine liability based on the evidence at trial.

*Id.,* 230 Kan. at 292–93, 294, 637 P.2d at 1179, 1180 (emphasis added).

We thus turn our attention to the first of these two threshold requirements, whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. The *Roberts* court provided the following guidelines for courts faced with this question:

[L]iability may be found only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.... [L]iability may be found to exist generally in a case when the recitation of facts to an average citizen would arouse resentment against the actor, and lead that citizen to spontaneously exclaim, "Outrageous!"

*Id.,* 230 Kan. at 293, 637 P.2d at 1179. It is apparent from our examination of the plaintiffs' allegations that, even accepting all such allegations as true, the defendants' conduct falls short of that required to permit recovery for outrage.

As to the second threshold requirement, whether the emotional distress suffered by the plaintiffs is sufficiently severe, the *Roberts* court cautioned: "The extreme distress required must be reasonable and justified under the circumstances, and there can be no liability where the plaintiff has appeared to suffer exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor had knowledge." *Id.,* 230 Kan. at 294, 637 P.2d at 1180. While most people would be somewhat distressed at learning that they had lost most of a $5,000.00 investment, we do not believe it would be reasonable to label such distress "extreme." Moreover, assuming these plaintiffs could establish a peculiar susceptibility to such distress, we have no indication that defendants were aware of such heightened susceptibility. Accordingly, plaintiffs also fail to meet this second threshold requirement for recovery on their claim for outrage. We must thus grant defendants' motion for partial summary judgment as to this claim.

III. *Liability of Mr. Gelman for Punitive Damages.*

Under each of plaintiffs' five counts, they seek to recover both actual and punitive damages.

The law of Kansas permits an award of punitive damages "when the elements of fraud, malice, gross negligence or oppression accompany the wrongful act. Such damages are awarded to punish the wrongdoer for his malicious, vindictive, wilful or wanton invasion of the injured person's rights. They also serve as an example to restrain and deter others from the commission of such wrongs." *Miller v. Cudahy Co.,* 592 F.Supp. 976, 1006 (D.Kan.1984) (quoting *Kline v. Multi-Media Cablevision, Inc.,* 233 Kan. 988, 989, 666 P.2d 711, 713 (1983)).

Most of defendants' brief in support of this aspect of their motion for summary

judgment deals with their contention that they have not committed fraud. Although we note that plaintiffs' evidence as to fraud is indeed rather weak, we find it unnecessary to address defendants' contention in this regard. Even defendants concede that plaintiffs' churning claim must go to trial. Although we have found no reported Kansas decision involving churning, we assume that Kansas does follow the general rule in recognizing this tort. Moreover, a recent annotation on the subject suggests that, as an intentional tort, a churning claim should subject a broker to liability for punitive damages. Annot., 32 A.L.R.3d 635, 640 (1970). We agree. The Kansas courts have defined "maliciousness" (one of the grounds on which punitive damages may be awarded) as "the intentional doing of a wrongful act with full knowledge of its character, and without cause or excuse." *Donley v. Amerada Petroleum Corp.*, 152 Kan. 518, 524, 106 P.2d 652, 656 (1940), *quoted in Miller*, 592 F.Supp. at 1006. Clearly, the churning alleged by these plaintiffs may be found to fall within this definition of "maliciousness." Because plaintiffs may be entitled to recover punitive damages on their churning claim, we must deny defendants' motion for partial summary judgment as to Mr. Gelman's liability for punitive damages.

## IV. *Liability of GNP for Punitive Damages.*

Having determined that Mr. Gelman may be liable for punitive damages, we must still address the potential liability of GNP for such damages. Kansas has expressly rejected a rule of "vicarious liability" for punitive damages, in favor of a "complicity" rule. *See Kline*, 233 Kan. at 990–91, 666 P.2d at 713–14. Under this complicity rule, a corporation is not liable for punitive damages for an employee's tortious acts committed in the scope of his employment unless:

(1) the corporation or its managerial agent authorized the doing and manner of the act;

(2) the employee was unfit and the corporation or its managerial agent was reckless in employing or retaining him;

(3) the employee was employed in a managerial capacity and was acting in the scope of employment; or

(4) the corporation or its managerial agent ratified or approved the act of the employee.

*Id.*, 233 Kan. at 994, 666 P.2d at 716.

■ In the instant case, plaintiffs contend that GNP authorized the other defendants' tortious acts by agreeing to indemnify Mrs. Gelman for any liability she might incur as a result of claims arising out of trading losses and improprieties sustained by GNP clients she solicited. We reject this allegation of authorization. Clearly, such an indemnification agreement falls far short of authorization to commit tortious acts. No corporation would "authorize" an employee to engage in activities for which the corporation agreed in advance to be financially liable. On the contrary, this indemnification agreement actually supports Mrs. Gelman's contention that her only duty at GNP was to solicit new clients and that GNP recognized this fact by insulating her from any claims for wrongful management of client accounts. In any event, plaintiffs' argument concerning this indemnification agreement must fail for the obvious reason that we have already granted defendants' motion for summary judgment as to Mrs. Gelman. GNP can hardly be held liable for authorizing tortious acts by Mrs. Gelman if Mrs. Gelman committed no such acts.

■ As to the second ground on which GNP might be held liable for punitive damages, plaintiffs have failed to demonstrate that GNP was reckless in employing or retaining either of the Gelmans. Both had had prior experience in commodities trading, and neither had had any complaints filed against them. GNP made a rather thorough search for such complaints by contacting the Gelmans' prior employers and the CFTC.

The third ground on which GNP might be liable for punitive damages is obviously inapplicable, since neither of the Gelmans were employed in a managerial capacity.

■ Finally, plaintiffs assert that GNP ratified or approved of the Gelmans' wrongful acts. In support of this view, plaintiffs point out that Mr. Gelman's supervisor, Mr. Furlett, failed to prevent the alleged churning, and that GNP failed to discipline Mr. Gelman. We find that plaintiffs have failed to demonstrate any such ratification. Although Mr. Furlett did fail to prevent the alleged churning, plaintiffs themselves were largely responsible for this. In his affidavit, Mr. Furlett explains that he reviewed all the trades made by the brokers he supervised and that he paid special attention to trades in "discretionary" or "managed" accounts (such as that at issue here). He could recognize such accounts by a symbol placed on the computer printouts of those trades. However, that symbol did not appear next to plaintiffs' account because plaintiffs had failed to return the GNP Agreement for Controlled, Managed or Discretionary Account. Had Mr. Kupka completed and returned that form, Mr. Furlett might have questioned the large number of trades in the account. As it was, Mr. Furlett reasonably believed that each of those trades had been consummated at the express direction of Mr. Kupka. Therefore, Mr. Furlett (as GNP's managerial agent) did not ratify Mr. Gelman's trading activity. Nor may such ratification be inferred from GNP's failure to discipline Mr. Gelman. Until this suit was filed, GNP had received no complaint from the plaintiffs regarding Mr. Gelman's actions.

Because plaintiffs have failed to demonstrate that GNP met any of these four "complicity" elements, we must conclude that GNP may not be held liable for punitive damages. Accordingly, that aspect of defendants' motion for summary judgment which deals with this issue must be granted.

As a result of this memorandum and order, the following claims have been removed from this case: (1) all claims against Mrs. Gelman, (2) the claim for outrage against the remaining two defendants, and (3) the claim for punitive damages against GNP. Remaining to be tried are plaintiffs' claims for actual damages against GNP and for both actual and punitive damages against Mr. Gelman.

IT IS THEREFORE ORDERED that defendants' motion for partial summary judgment is granted as to all claims against defendant Sharon J. Gelman, the claim for outrage against all defendants, and the claim for punitive damages against defendant GNP Commodities, Inc.

IT IS FURTHER ORDERED that defendants' motion for partial summary judgment is denied as to plaintiffs' claim for punitive damages against defendant Paul Gelman.

## ON MOTION FOR RECONSIDERATION

This matter comes before the court on plaintiffs' motion for reconsideration of our Memorandum and Order of March 24, 1986. In that order, we granted defendants' motion for summary judgment as to: (1) all claims against defendant Sharon J. Gelman ["Mrs. Gelman"], (2) the outrage claim against both remaining defendants, and (3) the claim for punitive damages against defendant GNP Commodities, Inc. ["GNP"]. Plaintiffs ask us to reconsider our ruling as to the first and third of these three items. For the reasons that follow, we decline to do so. Plaintiffs' request for oral argument is also denied. *See* Local Rule 15(d).

### I. *As to Claims Against Mrs. Gelman.*

In our Memorandum and Order of March 24, 1986, we concluded that "[p]laintiffs have failed to present any evidence that Mrs. Gelman executed any trades in the plaintiffs' account or made any material misrepresentations of fact." Plaintiffs now contend that Mrs. Gelman misrepresented that she would be handling their account along with her husband. They base this contention on a letter they received from GNP that was signed by Mrs.

Gelman and concluded with the sentence: "I look forward to working with you." Additionally, they received Mrs. Gelman's business card listing her title as "Senior Account Executive." Mrs. Gelman later testified at her deposition that she had no involvement in the management of plaintiffs' account.

██ Even assuming the innocuous statement "I look forward to working with you" constituted a misrepresentation of fact, we do not find it actionable. "Actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably *relies* on the statement and acts to his injury and damage." *Weigand v. Union National Bank of Wichita*, 227 Kan. 747, 753, 610 P.2d 572, 577 (1980) (emphasis added). Moreover, "[r]eliance in a fraudulent misrepresentation case must be reasonable, justifiable *and detrimental."* *Hutchinson Travel Agency, Inc. v. McGregor*, 10 Kan. App.2d 461, 464, 701 P.2d 977, 980 (1985) (emphasis added). Here, plaintiffs knew that defendant Paul Gelman ["Mr. Gelman"] would be handling their account. Moreover, based on plaintiffs' own allegations, it was *Mr.* Gelman's activities that resulted in the churning of their account. Mrs. Gelman did *not* represent that she would prevent her husband from mishandling plaintiffs' account. Accordingly, plaintiffs cannot show *detrimental reliance* on Mrs. Gelman's alleged misrepresentation that she would be handling plaintiffs' account along with her husband.

II. *As to Punitive Damages Claim Against Defendant GNP.*

As we noted in our Memorandum and Order of March 24, 1986, Kansas law does not permit a corporation to be held vicariously liable for punitive damages. Rather, a plaintiff must prove that the corporation was in "complicity" with an employee who committed a tortious act within the scope of his employment. *Kline v. Multi-Media Cablevision, Inc.*, 233 Kan. 988, 990–91,

666 P.2d 711, 713–14 (1983). Such complicity exists only if:

(1) the corporation or its managerial agent authorized the doing and manner of the act;

(2) the employee was unfit and the corporation or its managerial agent was reckless in employing or retaining him;

(3) the employee was employed in a managerial capacity and was acting in the scope of employment; or

(4) the corporation or its managerial agent ratified or approved the act of the employee.

*Id.*, 233 Kan. at 994, 666 P.2d at 716. After examining the undisputed facts in the light most favorable to plaintiffs, we concluded in our earlier memorandum and order that plaintiffs had failed to prove GNP's complicity in Mr. Gelman's activities under any of these four standards.

A. *Vicarious Liability.*

In their motion for reconsideration, plaintiffs renew their argument that we should ignore the Kansas complicity rule and hold GNP *vicariously* liable for punitive damages on the basis of Mr. Gelman's activities. They base their argument on section 2(a)(1)(A) of the Commodities Exchange Act ["CEA"], which provides, in part, as follows:

The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

In *Larson v. GNP Commodities, Inc.*, Comm.Fut.L.Rep. (CCH) ¶ 22,900 (Jan. 10, 1986), an administrative law judge applied this vicarious liability rule against GNP in the context of a churning claim. Due to the special nature of commodities fraud, plaintiffs ask that the CEA rule be given precedential effect under Kansas law.

We must decline this invitation. First, under the rule of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we are obligated to apply Kansas law in this diversity action. Although Kansas courts would be free to adopt the CEA rule, thus carving out an exception to the complicity rule for imposition of punitive damages against a corporation, they have not yet chosen to do so. Accordingly, we must apply the complicity rule as currently enunciated by the Kansas courts.

In any event, the CEA presents rather weak authority for plaintiffs' position that GNP should be held vicariously liable for punitive damages. Although the CEA does provide for vicarious liability in a case such as this, that Act also specifically limits an aggrieved party's relief to an award of "actual damages." 7 U.S.C. § 25(a); *Lopez v. Dean Witter Reynolds, Inc.,* 591 F.Supp. 581, 589 (N.D.Cal.1984). As we explained in our earlier memorandum and order, GNP is already subject to vicarious liability for *actual* damages based on Mr. Gelman's activities. The CEA rule would thus permit no broader relief than does existing Kansas law.

### B. *Complicity.*

Anticipating our rejection of their vicarious liability argument, plaintiffs further contend that GNP's activities amounted to complicity in the activities of Mr. Gelman. Plaintiffs' argument is based on two of the four standards by which complicity may be shown: (1) authorization and (2) ratification. We examine each of these two arguments in turn.

#### (1) *Authorization.*

In our Memorandum and Order of March 24, 1986, we concluded that plaintiffs themselves were largely responsible for the failure of Mr. Gelman's supervisor (Norman Furlett) to prevent Mr. Gelman's alleged churning of plaintiffs' account. Plaintiffs had failed to return the form authorizing GNP to treat their account as a discretionary one, and Mr. Furlett understood the

absence of such a form to mean that the account was *non*-discretionary. Because all trades in non-discretionary accounts had presumably been authorized by the customer, less supervision was given to brokers trading in such accounts. Plaintiffs contend that Mr. Gelman failed to tell them to return the discretionary account authorization form, presumably for the express purpose of deceiving Mr. Furlett into providing less stringent supervision of his trading activities. On the basis of evidence presented for the first time in conjunction with the instant motion for reconsideration, plaintiffs allege that GNP had a "pattern, plan and scheme" to defraud its customers in this way. This new evidence consists of four reparations complaints filed with the Commodity Futures Trading Commission against GNP, plus the ALJ's decision in *Larson* on a fifth such complaint. According to plaintiffs:

> This evidence demonstrates GNP and its brokers do not obtain discretionary account forms (in order to give an appearance that the account is non-discretionary) but then allow trades to be made at the discretion of the broker (the hallmark for a discretionary account) which ultimately results in churning of the account.

Plaintiffs' Memorandum in Support, at 2.

Although plaintiffs allege that the facts of the instant case fall within the "pattern" described above, the reparations complaints provide no support for such a pattern. Neither *Larson* nor three of the four non-adjudicated complaints even mentions a discretionary account form. They are thus irrelevant to this question. The complaint filed by Hendrik N. Sliphorst does contend that he returned no such form to GNP, but Mr. Sliphorst does not claim that the result was less effective supervision of his broker by GNP. Therefore, not even the Sliphorst complaint offers support for plaintiffs' allegation that GNP (through Mr. Furlett's deficient supervision) actually *authorized* Mr. Gelman's alleged churning. Indeed, the ALJ in *Larson* specifically concluded that Mr. Furlett did *not* fail to provide

adequate supervision of the broker named in that complaint.

██ Moreover, even if the reparations complaints did establish the pattern alleged by plaintiffs, the evidence submitted in conjunction with defendants' motion for summary judgment is sufficient to remove *this* case from such a pattern. For instance, the initial letter from GNP to the plaintiffs (signed by Mrs. Gelman) offered the following instructions:

> Enclosed you will find the necessary material for opening your account.
>
> 1. Read, complete, and sign all enclosed account forms.
>
> 2. If you wish to open a managed account, *read and sign the Managed Account Form* (optional).

Plaintiffs' Memorandum in Support, EXHIBIT J (emphasis added). As indicated above, Mr. Furlett reasonably understood the plaintiffs' failure to return such a managed account form as their opting for a non-discretionary account. Plaintiffs have not shown that Mr. Furlett failed to provide the level of supervision appropriate to such an account. Accordingly, GNP cannot be found to have authorized the churning allegedly committed by Mr. Gelman.

### (2) *Ratification.*

██ Plaintiffs' ratification argument is essentially a dual one. It is based on Mr. Furlett's alleged failure to:

(1) enforce a CEA rule requiring commodities futures brokers to record each customer's occupation, and

(2) monitor all phone calls between plaintiffs and Mr. Gelman.

Neither aspect of plaintiffs' ratification argument is persuasive.

CEA Regulation 1.37(a) requires commodities futures brokers to keep a record, as to each commodity option account, of "the appropriate occupational code or codes for such account." Comm.Fut.L.Rep. (CCH) ¶ 2166. On no document they completed and returned to GNP did plaintiffs ever indicate the occupation of Lara Kupka, in whose name plaintiffs' account was opened. Lara, of course, was Mr. and Mrs. Kupka's eight-year-old daughter. According to plaintiffs, had GNP enforced the regulation regarding occupational codes, GNP would not have allowed a commodity futures trading account to be opened in the name of Lara Kupka. Because Mr. Furlett did approve the opening of the account, he is accused of ratifying Mr. Gelman's violation of the regulation.

On the present record, however, the occupational argument has far less merit than appears at first blush. There is no indication that GNP's failure to request the occupation of Lara Kupka was at all causally related to plaintiffs' loss. Although plaintiffs' account was opened in Lara's name, all parties were aware that *Mr.* Kupka would be responsible for the account. Indeed, plaintiffs' $5,000.00 investment had come from an insurance settlement received by Mr. Kupka. Thus, the "appropriate occupational code" would have been Mr. Kupka's occupation—airline flight attendant. Plaintiffs do not contend that flight attendants are ipso facto inappropriate candidates for commodities futures trading accounts. Accordingly, we have no evidence that GNP was remiss in permitting plaintiffs to open the account in question.

Moreover, in view of the fact that Mr. Kupka was actually responsible for plaintiffs' account, GNP did comply with Regulation 1.37(a). A note attached to plaintiffs' own memorandum in opposition to defendants' motion for summary judgment came from Mr. Gelman's files and specifically refers to Mr. Kupka as "Flight Attendant for TWA." Because the regulation does not state that a customer's occupation must be written by the customer himself, we conclude that Mr. Gelman's handwritten note did constitute compliance with the regulation.

As to the second aspect of plaintiffs' ratification argument, it is important to note that GNP apparently records all phone calls between its brokers and its customers. Mr. Furlett concedes that he failed to monitor the calls between Mr. Kupka and Mr.

Gelman regarding the trading in plaintiffs' account. Had he done so, Mr. Furlett would presumably have discerned that plaintiffs' account was in fact discretionary. He would then have given Mr. Gelman's activities the greater degree of scrutiny appropriate to such an account. Plaintiffs contend that Mr. Furlett's failure to monitor these phone calls constituted a breach of his "obligation and duty" to monitor the trading in plaintiffs' account. When pressed to state the source of such obligation, plaintiffs respond: "This obligation and duty arises from the internal custom and practice of GNP as revealed by Norman Furlett in his deposition." Plaintiffs' Reply Memorandum, at 3.

Even assuming that plaintiffs' inferences are valid (*i.e.*, (1) that monitoring of these phone calls would have revealed the account's discretionary nature, (2) that such knowledge would have led to greater scrutiny on the part of Mr. Furlett, and (3) that such scrutiny would have prevented the alleged churning by Mr. Gelman), we must reject this argument. The flaw in plaintiffs' argument is their assumption that legal obligations may arise from the internal custom and practice of private entities. Clearly, this is not the case. Were it so, entities such as GNP would attempt to protect themselves from legal liability by developing extremely lax internal safeguards. The public policy in favor of more stringent internal safeguards would thus be defeated. On the contrary, legal obligations arise from the rules of law enunciated either by the legislature or by the courts. Plaintiffs have pointed to no such rule of law requiring Mr. Furlett to monitor the phone calls between Mr. Kupka and Mr. Gelman. Thus, Mr. Furlett may not be charged with constructive knowledge of the discretionary nature of plaintiffs' account. It further follows that Mr. Furlett's reasonable ignorance of the account's discretionary nature shields GNP from a finding that it ratified Mr. Gelman's allegedly wrongful activities.

Plaintiffs having failed to convince us that GNP may be vicariously liable for punitive damages, or that GNP's activities amounted to the authorization or ratification needed to prove complicity in Mr. Gelman's activities, we adhere to our earlier ruling that GNP may not be held liable for punitive damages. Similarly, we affirm our order granting Mrs. Gelman's motion for summary judgment as to all claims against her.

IT IS THEREFORE ORDERED that plaintiffs' motion for reconsideration of our Memorandum and Order of March 24, 1986, is denied.