No. 52,288

Loretta F. Roberts, *Appellant,* v. Leslie L. Saylor, *Appellee.*

(637 P.2d 1175)

Opinion filed October 23, 1981.

*Fred W. Phelps, Jr.,* of Fred W. Phelps, Chartered, of Topeka, argued the cause, and *Margie J. Phelps,* of the same firm, and *Robert D. Ochs,* of Fisher, Ochs & Heck, P.A., of Topeka, were with him on the briefs for the appellant.

*Edwin D. Smith,* of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause, and *J. Steven Pigg,* of the same firm, was with him on the briefs for the appellee.

The opinion of the court was delivered by

Fromme, J.: The present appeal concerns a claim against a doctor for causing plaintiff emotional distress. This type of claim is generally referred to as based on the tort of outrage. The trial court sustained a motion for summary judgment in favor of defendant based on the pleadings, stipulations, admissions, and

deposition of the plaintiff. The Court of Appeals reversed the judgment and remanded the case for trial. The case is now before this court on an order granting defendant's Petition for Review.

The factual background necessary to understand the circumstances which gave rise to this claim spans three separate operations which the plaintiff has survived. The first operation was by a Dr. McClure, the second by Dr. Saylor, and the third by a Dr. McElroy. Dr. Saylor operated on December 27, 1974, and during this operation removed two silk sutures which had remained in plaintiff's body after the first operation performed by Dr. McClure. Dr. Saylor continued to care for Mrs. Roberts until she had recovered and her wound from the operation had healed. However, because of having the two silk sutures left in her, plaintiff filed a medical malpractice action against Dr. McClure.

Mrs. Roberts and her attorney sought testimony from Dr. Saylor to maintain this suit against Dr. McClure. Dr. Saylor did not believe the suit was justified and informed Mrs. Roberts and her attorney of this conclusion. Mrs. Roberts by deposition testified as follows:

"Well, he told me that he was sorry he ever had anything to do with me; that he despised people like me and my family for causing doctors trouble, and we was a bunch of thieves without a gun. is what he said."

As a result of Dr. Saylor's refusal to cooperate with plaintiff, she filed a suit against Dr. Saylor. This suit was subsequently settled and dismissed. Three years later the incident which is the basis for the present suit occurred. This was on January 26, 1978.

At this time plaintiff was about to have surgery performed by Dr. McElroy for repair of an incisional hernia. She had been administered preoperation medication and was lying on a cart or gurney in a preoperation room at Stormont-Vail Hospital. The room was enclosed with glass doors. The doctor's lounge was close by and Dr. Saylor had been there scheduling surgery on his wrist with a Dr. Sergio Delgado. Dr. Saylor came out of the doctor's lounge and was standing in front of the glass doors of the preoperation room where the plaintiff was awaiting surgery. Up to this point there is no disagreement as to the facts. Thereafter, a sharp conflict appears between the deposition testimony of the plaintiff, Mrs. Roberts, and that of the doctor, Dr. Saylor. Mrs. Roberts testified:

"A. I seen him standing out there, and pretty soon I just turned back over and I

heard the doors open. And I never thought nothing about it until I heard Dr. Saylor ask the nurse, 'Who you got there?' And she said, 'Loretta Roberts.' He says, 'Well, I told her once that I didn't like her,' and he says, 'I came here to tell her again,' he says, and then about that time I looked up at him and he says, 'I don't like you, I don't like you,' and he says, 'I wanted to tell you that before you went in there.' He was real hostile in the face when I looked back up at him from the cart."

### Dr. Saylor's deposition testimony was as follows:

"A. I stopped there when the nurse from the room came to the door and opened the door, sliding glass door. And there is a hall, the patient's waiting room was over there and the sliding glass door. And there was a patient in there. And the nurse came and opened the door and asked me a question. She said, 'Do you know Loretta Roberts, Dr. Saylor?' That was the question.

. . . .

"Q. What did you say when she asked you that?
"A. I answered her and said, 'Yes, I know Loretta Roberts. And I don't like her anymore now than I have in the past.'
"Q. You told Miss Burgland that?
"A. Yes, those were my very words.
"Q. What did Mrs. Burgland say to that, sir?
"A. She said nothing that I recall.
"Q. What did she do?
"A. I don't remember. I went on out the door. I paid no attention to anyone else. I went on my way."

In considering whether it was error for a trial court to grant summary judgment for defendant in this type of case, an appellate court must disregard the doctor's version of what occurred and accept as true the version of the plaintiff. This we will do. At this point it is sufficient to note that the plaintiff was operated successfully and recovered therefrom. It is agreed by both parties that plaintiff suffered emotional distress, and that no bodily harm resulted from the conduct of the doctor. We will return to these facts later.

Let us now consider, generally, the type of action which arises from the infliction of mental distress, the tort of outrage. The law has been slow to accept an interest in peace of mind as being entitled to independent legal protection, even as against intentional invasions. Various reasons have been advanced for this reluctance to redress purely mental injuries. One such reason is the difficulty of proof, or of measurement of the damages. It has been said that mental consequences are so intangible and vary so much with the individual that they cannot be anticipated, and therefore lie outside the boundaries of any reasonable direct

connection with the act of the defendant. The most valid objection to recognizing and protecting such interest or right to freedom from emotional distress lies in the alleged difficulties in containing or restricting such actions to bona fide claims where emotional distress has been truly severe. Once the tort of outrage is recognized, the doors of the courts are opened wide, not only to fictitious claims, but to litigation in the field of trivialities and mere bad manners. Prosser, Law of Torts (4th ed. 1971) at 51.

Kansas first recognized the tort of outrage and opened the doors of our courts in 1974 when *Dawson v. Associates Financial Services Co.,* 215 Kan. 814, 529 P.2d 104 (1974), was decided. Since *Dawson* was decided the following cases have reached the appellate courts of this state: *Dotson v. McLaughlin,* 216 Kan. 201, 531 P.2d 1 (1975); *Vespa v. Safety Fed. Savings & Loan Ass'n,* 219 Kan. 578, 582, 549 P.2d 878 (1976); *Bradshaw v. Swagerty,* 1 Kan. App. 2d 213, 216, 563 P.2d 511 (1977); *Wiehe v. Kukal,* 225 Kan. 478, 592 P.2d 860 (1979); *Young v. Hecht,* 3 Kan. App. 2d 510, 514, 597 P.2d 682 (1979). It is apparent on reading these cases that our courts have not been flooded with fictitious claims or litigation in the field of trivialities. Restrictions on this litigation have been adequate.

Out of the foregoing cases the law has developed and a cause of action has emerged in Kansas for the intentional infliction of mental distress. No bodily harm to the plaintiff is required to support such an action. One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. *Dawson v. Associates Financial Services Co.,* 215 Kan. at 822; *Dotson v. McLaughlin,* 216 Kan. at 209. Proof of four elements is required to establish the cause of action: (1) The conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe.

Liability for extreme emotional distress has two threshold requirements which must be met and which the court must, in the first instance, determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered

by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it. *Bradshaw v. Swagerty,* 1 Kan. App. 2d at 216; *Dotson v. McLaughlin,* 216 Kan. at 211; *Dawson v. Associates Financial Services Co.,* 215 Kan. at 824; Restatement (Second) of Torts § 46 (1), comments *h* and *j* (1965).

It is apparent from the foregoing that certain protections have been afforded defendants against fictitious claims and litigation based on trivialities or mere bad manners. These protections are peculiar to actions based on the tort of outrage. The first of these threshold requirements or protections which must be met, and which the court must in the first instance determine, is that the defendant's conduct must be found to be so extreme and outrageous as to permit recovery. So what is the test of this necessary extreme and outrageous conduct? In *Dotson v. McLaughlin,* 216 Kan. at 210, Mr. Justice Prager speaking for the court adopted guidelines from the Restatement of Torts. It was pointed out that recovery must depend on the facts and circumstances of each case but liability may be found only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. It was further said that liability may be found to exist generally in a case when the recitation of facts to an average citizen would arouse resentment against the actor, and lead that citizen to spontaneously exclaim, "Outrageous!"

It should be understood that liability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind. The law should not intervene where someone's feelings merely are hurt. Freedom remains to express an unflattering opinion and to blow off relatively harmless steam which comes from an uncontrollable temper. Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society.

The second threshold requirement which must be met and which the court must first determine as present is that the plain-

tiff's emotional distress is sufficiently severe, genuine and extreme that no reasonable person should be expected to endure it.

Emotional distress passes under various names such as mental suffering, mental anguish, nervous shock, and includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, embarrassment, anger, chagrin, disappointment, and worry. However, it is only when emotional distress is extreme that possible liability arises.

The extreme distress required must be reasonable and justified under the circumstances, and there can be no liability where the plaintiff has appeared to suffer exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor had knowledge. *Dawson v. Associates Financial Services Co.,* 215 Kan. at 820; Restatement (Second) of Torts § 46 (1), comment *f.* The emotional distress must in fact exist, and it must be severe. Prosser, Law of Torts (4th ed. 1971) at 59.

In the first instance the court must determine if these threshold requirements have been met. If the court determines from the pleadings, stipulations, admissions, and deposition of the plaintiff that reasonable fact finders might differ as to whether defendant's conduct was sufficiently extreme and outrageous as to subject him to liability for emotional distress, and if the court further determines plaintiff's emotional distress was such that reasonable fact finders might differ as to whether plaintiff's emotional distress was genuine and so severe and extreme as to result in liability, then and only then, it must be left to the jury to determine liability based on the evidence at trial. *Dawson v. Associates Financial Services Co.,* 215 Kan. at 824; *Dotson v. McLaughlin,* 216 Kan. at 211; *Bradshaw v. Swagerty,* 1 Kan. App. 2d at 216; Restatement (Second) of Torts § 46(1), comments *h* and *j.*

Now let us turn to the particular facts alleged in this case and consider those elements necessary to a cause of action for mental distress. Was the conduct of defendant intentional? Based upon the allegations and the deposition testimony of plaintiff, the conduct of defendant was deliberate and intentional. We do not need to belabor that question to answer in the affirmative.

Next, was defendant's conduct extreme and outrageous so as to meet the first threshold requirement to be decided by the judge?

We accept the plaintiff's allegations, which we must. The defendant had previously treated plaintiff as a patient, had disagreed with her decision to sue a former doctor who had left silk sutures in her body, had referred to plaintiff as a thief without a gun for bringing an action, had refused to cooperate with her in supporting her action, had then been sued by plaintiff, and had settled the case. Keeping this background in mind, we consider the conduct in issue. The plaintiff by deposition testified she was in the hospital, she was about to have surgery to repair a hernia, and while on the gurney waiting to be taken to the hospital operating room she was approached by the defendant-doctor. The doctor is alleged to have come into the room where plaintiff was being prepared for surgery, to have stood near where she was lying and, with a hostile look on his face, to have stated in a loud voice in the presence of a nurse and another patient, "I came here to tell her again. I don't like you, I don't like you. I wanted to tell you that before you went in there."

With the foregoing in mind, was defendant's conduct sufficiently extreme and outrageous as to subject the doctor to liability for emotional distress? This court holds it was not. The defendant-doctor's dislike for plaintiff could not have come as a surprise to her. There was no doctor-patient relationship existing between plaintiff and defendant at that time. This was apparently a chance encounter between two persons, each seeking medical treatment. The defendant informed the plaintiff of his dislike for plaintiff who had previously sued him in court. This could not be entirely unexpected under the circumstances. We hold the conduct was not so extreme in degree, as to go beyond the bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized society. The conduct falls in the area of mere insults, indignities, petty expressions to which members of society are necessarily expected and required to be hardened. The law should not intervene where someone's feelings merely are hurt. Freedom remains to express an unflattering opinion in an angry manner.

Next we will consider the second threshold question. Was the emotional distress evidenced by plaintiff such that reasonable fact finders might differ as to whether it was genuine and so severe and extreme that no reasonable person should be expected to endure it?

Plaintiff's deposition testimony as to the nature and extent of her emotional distress was as follows:

"Q. Well, what other damages, or what is it that you're claiming by way of damages in this case; how have you been injured or damaged by what occurred that day?

"A. Because I'm upset about it; I'm still upset. I was upset then and I'm still upset.

"Q. Well, is that all?

"A. When I seen him down there I was afraid that maybe he would come in there and try to do something to me, I didn't know.

"Q. You were going to sue him anyway?

"A. No, no, no, no.

"Q. Well, other than being upset, you were already upset before he ever said this. Is there anything else?

"A. Upset before?

"Q. You said you were always upset about this, and you were upset before he came in, isn't that right?

"A. I just got partially calmed down from what he said to me the time before, and then he came back again and started harassing me again this last time.

"Q. Well, my question is, in what way do you claim that you've been injured or damaged by what occurred while you were in the hospital on that day, January of this year?

"A. I'm nervous from all of it. I don't know what kind of damage you're talking about.

"Q. I'm trying to find out — I'm not talking about any, I'm trying to find out —

"A. Didn't do no bodily harm to me."

Then on cross-examination by her own attorney plaintiff testified that as a result of defendant's conduct she was scared and didn't want to go into surgery.

The surgery was performed successfully. Although she expressed a continuing concern and nervousness resulting from the incident, such was the total extent of her emotional distress. There is no indication that psychiatric or further medical treatment or medications were necessary or that she was unable to function in a normal way thereafter.

After a careful review of the entire record it is apparent that plaintiff's emotional distress resulting from the incident was not so severe that no reasonable person should be expected to endure it. There can be little doubt that plaintiff did express fright, embarrassment and worry but this appears of the nature which is not actionable. The emotional distress suffered by her was resentment and upset which normally results from acts and criticism which are inconsiderate and unkind. The law should not intervene where someone's feelings merely are hurt.

Accordingly we hold that neither threshold requirement was

shown to have been met and summary judgment in favor of defendant was proper.

The judgment of the Court of Appeals as to the tort of outrage is reversed. The judgment of the district court is affirmed, and summary judgment is hereby entered in favor of defendant.

PRAGER and HERD, JJ., not participating.