Kenneth Daniel RUPP II, Plaintiff,

v.

**PUROLATOR COURIER CORP., Emery Air Freight Corp., Mark Fitzgerald, and Jerry Meyer, Defendants.**

**Civ. A. No. 90–1192–T.**

United States District Court,
D. Kansas.

April 28, 1992.

---

Jack Focht, Focht, Hughey, Hund and Calvert, Wichita, Kan., for plaintiff.

Stephen M. Joseph, Joseph, Robison & Anderson, P.A., Wichita, Kan., John J. Yates, Robert J. Harrop, Douglas Balcombe, Gage & Tucker, Kansas City, Mo., for defendants.

## OPINION AND ORDER

THEIS, District Judge.

Plaintiff Rupp brings this action against the defendants for retaliation, adverse treatment and constructive discharge in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and the Kansas Act Against Discrimination, Kan.Stat.Ann. § 44–1001, *et seq.* (KAAD). The plaintiff also alleges common law violations of wrongful discharge, retaliation, whistleblowing, and outrage. The defendants now present the court with a motion for partial summary judgment on the state pendent claims, contending that the common law claims of wrongful discharge, retaliation and whistleblowing are precluded by Title VII and KAAD; and that the tort of outrage must fail as a matter of law.

## UNCONTROVERTED FACTS

Plaintiff Rupp was employed by Defendant Purolator as a courier guard, whose responsibilities included picking up and delivering packages for the defendant. Rupp was promoted to lead courier at the Wichita terminal in early 1987. In addition to taking charge of daily operations at the Wichita terminal in his capacity as lead

courier, Rupp served as a driver on several routes, including one known as the Hutchinson route.

On March 25, 1988, the plaintiff learned that a female co-worker was sexually harassed by Mark Fitzgerald, a manager in the Omaha terminal who was in Wichita assisting with merger plans between Purolator and Emery. The plaintiff contacted his immediate supervisors, Kevin Cronin and Ken Braley about the alleged harassment.

When Purolator merged with Emery on March 28, 1988, Rupp elected to remain a driver without any managerial responsibilities. As a result of the merger, Rupp accepted a new expanded Hutchinson route, with which he was not fully familiar. Plaintiff satisfactorily completed the first day of his new route. That same day, after completing his route, the plaintiff confronted Fitzgerald with the allegations of sexual harassment. A heated discussion ensued, in which Fitzgerald became enraged and told the plaintiff that it was none of his business. The plaintiff became "real angry and anxious" and had trouble breathing, as a result of this confrontation. That evening, the plaintiff went to the hospital emergency room, and received some tranquilizers and a referral to a psychiatrist.

Plaintiff continued with his route the next day, March 29, 1988, but encountered some difficulties due to his unfamiliarity with the route and was unable to complete the route expeditiously. On March 30, 1988, Fitzgerald screamed at the plaintiff to "move it, move it, get going" before the plaintiff started his route. Fitzgerald also made the same remarks to the other drivers although, as the plaintiff contends, not with the "same vehemence."

That day, when the plaintiff again encountered difficulties during his run, he was taken off the Hutchinson route. Plaintiff was instead assigned general housekeeping duties at the terminal the following day, March 31, 1988. Although the plaintiff had previously undertaken housekeeping duties, he contends that it was unusual for full-time drivers, such as himself, to be assigned those duties. Plaintiff was also required to run a local route that day. The plaintiff claims that Jerry Meyer, the new Wichita terminal manager, "followed him around criticizing him and looking over his shoulder," as the plaintiff was preparing to leave for the local route.

That same morning, Fitzgerald and Meyer met with the plaintiff in a closed-door meeting after the plaintiff had taken too much time to complete the local route. Fitzgerald and Meyer were critical of the time it took the plaintiff to run his routes. According to the plaintiff, Fitzgerald and Meyer criticized his work performance, "flashing questions at [him] and not giving [him] enough time to answer." The plaintiff also contends that they were "real confrontational and harassing," by asking him "Why can't you do better?" and "What's your problem," and a series of other questions. Fitzgerald and Meyer also told the plaintiff that he was not a very good delivery driver and should be able to do better. The meeting lasted ten to fifteen minutes. The plaintiff claims that he had never heard other drivers spoken to in that manner.

After this meeting, the plaintiff returned to the emergency room to see a staff psychiatrist. The psychiatrist offered to prescribe some medication but the plaintiff declined "because he did not want to ingest strong antihistamines." Plaintiff was unable to work the following day due to his distress over the meeting with Fitzgerald and Meyer, and fearing another confrontation. However, he went in to work to pick up his pay check, and had lunch with a colleague.

In early April 1988, Meyer informed the plaintiff of the possibility of putting him back on the Hutchinson route. Meyer offered to ride with him on the Hutchinson route to help improve the plaintiff's efficiency. Meyer also informed the plaintiff that he had been "too hard" on the plaintiff, and that any past problems were "water under the bridge."

During the week ending April 8, 1988, the plaintiff received a lower paycheck than he was entitled to. The defendants attribute this to an accounting error but

the plaintiff contends that it was an attempt to harass him further. The plaintiff eventually received the full amount of the paycheck following his resignation.

During the week of April 11, 1988, the plaintiff had no problems with work performance and received no criticism. However, he still experienced some difficulty with paperwork and new delivery locations but was making improvements. On April 14, 1988, Meyer met with the plaintiff and gave him three choices: quit, work part-time, or try to keep the full-time Hutchinson route. The plaintiff claims that Meyer warned him that if he tried to keep the full-time route, "they'd take him in and talk to him like they did before." According to the plaintiff, Meyer indicated that his actions were prompted by the plaintiff's reporting of the sexual harassment incident.

However, the plaintiff admits that, during that same meeting, Meyer advised him not to quit and encouraged him to try the full-time Hutchinson route. The plaintiff offers to reconcile Meyer's inconsistent statements by hypothesizing that "they just wanted me around a little longer to harass me, then fire me before I could quit." Fearing further retaliation and confrontations, the plaintiff decided to quit. The plaintiff saw a psychiatrist and a psychologist for his distress on June 29, 1989, more than a year after he terminated his employment with the defendants.

## DISCUSSION

### WRONGFUL DISCHARGE, RETALIATION & WHISTLEBLOWING

The plaintiff seeks state common law remedies for the adverse employment actions allegedly taken against him for reporting a sexual harassment incident affecting a fellow employee. The defendants assert that Title VII and KAAD provide exclusive remedies for the plaintiff's alleged injuries, and thus preclude any recovery under state tort law.

Kansas law recognizes public policy limitations on the well-entrenched doctrine of at-will employment. Thus, when public policy is implicated, Kansas courts have recognized common law torts of wrongful discharge, retaliatory job actions and whistleblowing. *E.g. Murphy v. City of Topeka*, 6 Kan.App.2d 488, 630 P.2d 186 (1981). These state common law remedies, however, are not available when statutory law provides an adequate remedy to redress the plaintiff's injuries. *Polson v. Davis*, 895 F.2d 705, 709 (10th Cir.1990).

In the present case, no one disputes that Kansas public policy prohibits an employer from taking adverse employment actions against an employee for reporting sexual harassment. However, because the defendants' alleged violations are specifically proscribed by Title VII and KAAD,[1] statutory remedies are available to redress the plaintiff's injuries.

The plaintiff argues that the remedies provided by Title VII and KAAD are inadequate because KAAD imposes a monetary cap that would not adequately compensate the plaintiff for his "pain, suffering and humiliation." Although the plaintiff does not specify the remedial limitations of Title VII, presumably the equitable relief authorized by Title VII suffers from the same shortcomings. Plaintiff's argument is untenable, however. The mere fact that the tort remedies might provide greater compensation than the statutory remedies does not make the statutory remedies "so inadequate to enforce the stated public policy as to require bolstering by common law cause of action." *Polson*, 895 F.2d at 709–10. The remedies afforded by KAAD and Title VII in redressing employment discrimination are not inadequate simply because "one could conceive of a remedy offering more comprehensive relief." *Polson v. Davis*, 635 F.Supp. 1130, 1150 (D.Kan. 1986), *aff'd*, 895 F.2d 705 (10th Cir.1990).

The plaintiff also worries that the defendants might later argue that the alleged adverse employment actions do not

---

**1.** Title VII prohibits retaliation on account of an employee's opposition to discriminatory employment practices. 42 U.S.C. § 2000e–3(a). Kan.Stat.Ann. § 44–1009(a)(4) contains a similar prohibition.

fall within the ambit of Title VII or KAAD, thereby leaving the plaintiff with no relief whatsoever. The court finds the plaintiff's argument puzzling. Indeed, if the court should find that the plaintiff did not suffer retaliation or constructive discharge in violation of Title VII or KAAD, his common law claims of wrongful discharge, retaliation and whistleblowing must necessarily fail, as the statutory and common law actions share the same elements. Perhaps the plaintiff is afraid that, even if he proves retaliation and constructive discharge, his Title VII and KAAD claims would nonetheless fail if his supervisor's action were found not to constitute sexual harassment. Plaintiff's fears are unjustified. Title VII and KAAD protect an employee from adverse employment actions for whistleblowing even if the employee were ultimately mistaken on the merits of his charge. *See Love v. RE/MAX of America, Inc.*, 738 F.2d 383, 385 (10th Cir. 1984) ("opposition activity is protected when it is based on a mistaken good faith belief that Title VII has been violated"); *McCabe v. Board of Johnson County Comm'rs*, 5 Kan.App.2d 232, 615 P.2d 780 (1980) (KAAD protects employees for whistleblowing if they have a good faith reasonable belief of discrimination, whether or not actual discrimination exists). Moreover, the issue at hand is not whether sexual harassment had actually occurred but simply whether the defendants retaliated against or constructively discharged the plaintiff for reporting the sexual harassment. Finally, Plaintiff's fears should be allayed by the defendants' concession that the retaliatory actions, if proven, would be covered under Title VII and KAAD.

The court concludes that Title VII and KAAD provide exclusive remedies for the plaintiff's common law claims of retaliation, constructive discharge and whistleblowing. The plaintiff's common law claims are, therefore, dismissed.

## OUTRAGE

The plaintiff also brings a pendent claim based on outrage or the intentional infliction of emotional distress. Defendants argue that the uncontroverted facts reveal

that Plaintiff has failed, as a matter of law, to establish the tort of outrage.

Under Kansas law, a plaintiff claiming outrage must meet two threshold requirements by showing that (1) the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) the plaintiff's emotional distress is so extreme and severe that no reasonable person should be expected to endure it. *See Roberts v. Saylor*, 230 Kan. 289, 637 P.2d 1175 (1981). Mere insults, threats or annoyances do not rise to the level of outrage. The required threshold for an outrage claim is necessarily high to separate meritorious claims from those based on trivialities or hyperbole. *See Fletcher v. Wesley Medical Center*, 585 F.Supp. 1260, 1261–62 (D.Kan.1984).

In *Gomez v. Hug*, 7 Kan.App.2d 603, 645 P.2d 916, *rev. denied*, 231 Kan. 800 (1982), the Kansas Court of Appeals extended the tort of outrage to the employment discrimination setting where the plaintiff was repeatedly subjected to ethnic slurs and physical threats in conjunction with his discriminatory discharge. However, employment discrimination by itself, without the aggravating factors present in *Gomez*, would not amount to outrage. *See Smitley v. Cigna Corp.*, 640 F.Supp. 397, 401 (D.Kan.1986); *Fletcher*, 585 F.Supp. at 1261.

In the present case, Plaintiff alleges that the defendants subjected him to less favorable work assignments, changes in work assignments, constant and unwarranted criticism of work performance, reduction in hours and pay, and ultimate constructive discharge. The defendants' actions, argues the plaintiff, were so extreme and outrageous as to constitute an intentional infliction of emotional distress.

The court finds that the plaintiff's allegations of outrageous conduct by the defendants are unfounded. With respect to the unfavorable work assignments, the plaintiff points only to being switched from the Hutchinson route to local routes and asked to perform general duties at the terminal, which the plaintiff had done on previous occasions. Plaintiff himself admitted to

performing poorly on the Hutchinson route, missing pick-ups and deliveries. Even if such unfavorable work changes were retaliatory, they are not so severe or extreme as to support a tort of outrage. Plaintiff's claim of retaliatory reduction in pay and hours likewise suffers from the same infirmity. Viewed in conjunction with the defendants' other alleged actions, the pay reduction, even if motivated by retaliation, is not sufficiently outrageous in character or extreme in degree as "to go beyond the bounds of decency." *Roberts*, 230 Kan. at 293, 637 P.2d at 1179.

Further, although Plaintiff claims that he was constantly berated for his work performance, the record—even when viewed in the light most favorable to the plaintiff, as the court must do—does not indicate extreme conduct on the defendants' part. The plaintiff describes the closed-door meeting on March 31, 1988 as:

> "They took me in the office, closed the door and started criticizing, flashing questions at me and not giving me enough time to answer and being real confrontational and harassing." (Plaintiff's depo. p. 211). By the plaintiff's own admission, the extent of the defendants' confrontation and harassment consisted merely of directing questions to the plaintiff about his poor work performance, and firing questions in rapid succession at the plaintiff before he could complete his answers. Such conduct may make the defendants poor listeners or ill mannered individuals, but it certainly does not rise to the level of extreme and outrageous behavior. Likewise, Fitzgerald's act of screaming at the plaintiff to "move it" evidences, at worst, an unsavory lack of respect for his employees but does amount to a tort of outrage—particularly when other employees were similarly berated.

The circumstances surrounding the plaintiff's alleged retaliation and constructive discharge, when viewed in totality, do not meet the threshold requirement that the defendants' conduct be extreme and severe. Based on the pleadings, admissions and depositions, the court determines that reasonable fact finders could not differ as to whether the defendants' conduct was sufficiently outrageous as to subject them to liability for the tort of outrage. Defendants' conduct may well be retaliatory but it is not "atrocious and utterly intolerable in a civilized community." *Dotson v. McLaughlin*, 216 Kan. 201, 211, 531 P.2d 1, 11 (1975).

Because the court finds that the defendants' actions were not outrageous, it is not necessary to determine whether the plaintiff's injuries were sufficiently severe to maintain a tort of outrage. Accordingly, the court dismisses the plaintiff's outrage claim.

IT IS BY THIS COURT THEREFORE ORDERED that Defendants' Motion for Partial Summary Judgment (Doc. 38) is hereby granted.