**Debra Ann GILLUM, Plaintiff,**

v.

**FEDERAL HOME LOAN BANK OF TOPEKA and its representatives; and Charles R. Waggoner as defendants' representative and individually, Defendants.**

Civil Action No. 94–4197–DES.

United States District Court,
D. Kansas.

June 17, 1997.

Cheryl D. Myers, Michael B. Myers, Myers & Myers, Topeka, KS, for Debra Ann Gillum.

D. Brad Bailey, Office of U.S. Atty., Topeka, KS, Paul F. Figley, Jeffrey L. Karlin, Frank W. Hunger, U.S. Dept. of Justice, Civil Division, Washington, D.C., for defendants.

Patricia E. Riley, Weathers & Riley, Topeka, KS, Wesley A. Weathers, Weathers & Riley, Topeka, KS, for Federal Home Loan Bank, Charles R. Waggoner.

### MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

This matter is before the court on defendants' Motion for Summary Judgment (Doc. 26). Plaintiff has filed a Memorandum in Opposition to defendants' Motion (Doc. 29). Defendants have filed a Reply (Doc. 46). This case arises out of plaintiff's claim of hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, constructive discharge, and intentional infliction of emotional distress. For the reasons set forth below, defendants' motion is granted.

## I. FACTS

The following facts are either uncontroverted or, if controverted, construed in a light most favorable to the plaintiff as the non-moving party. Immaterial facts and factual averments not properly supported by the record are omitted.

Federal Home Loan Bank of Topeka ("FHLB") employed Debra Gillum ("Gillum") as a clerk in its collateral department from June 1989 to June 1993, first under the supervision of Sonia Betsworth ("Betsworth") and then, beginning in November of 1992, under the supervision of Charles Waggoner ("Waggoner"). In June 1993, Gillum resigned from her position at FHLB.

FHLB hired Waggoner in November of 1989 as the collateral review manager. As part of his duties, Waggoner conducted onsite inspections of collateral at the borrowing financial institutions. The collateral assistants, including Gillum, Michele Penry ("Penry"), and Sherri Bailey ("Bailey"), and the collateral review assistant, Sally Zeigler ("Zeigler"), took turns accompanying Waggoner on these inspection trips. As the collateral review manager, Waggoner supervised only the collateral review assistant, Zeigler. He did not supervise any of the collateral assistants until he was named collateral officer in November 1992. On trips, however, Waggoner was clearly in charge and was responsible for evaluating the collateral assistants that accompanied him.

During the time Waggoner worked with Gillum, first as co-worker and then as her supervisor, he engaged in conduct which Gillum claims created a hostile work environment within the meaning of Title VII. Gillum presents evidence of numerous instances of Waggoner's alleged misconduct. These and other relevant material facts are set forth in more detail throughout the court's discussion.

## II. SUMMARY JUDGMENT STANDARD

A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. at 2510. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* "Only disputes over facts that might properly affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir.1993). The movant may discharge its burden "by showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1985). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. at 2552–53.

Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (interpreting Fed. R.Civ.P. 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. at 2552. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. at 2552–53.

A court must view the facts in the light most favorable to the nonmovant and allow

848

the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) (stating that "[t]he court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues"). The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. at 2511.

### III. *DISCUSSION*

#### A. Sexual Harassment—Hostile Work Environment

■ Title VII prohibits sexual harassment in the workplace. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Sexual harassment under Title VII may be shown under either of two principal theories: quid pro quo discrimination or hostile work environment. *Id.* at 65–66, 106 S.Ct. at 2405. Plaintiff has made no quid pro quo claim that sexual favors were coerced in exchange for employment benefits. *See Hicks v. Gates Rubber Co.,* 833 F.2d 1406 (10th Cir.1987). Rather, she charges that discrimination based on sex created a hostile or abusive work environment.

■ A hostile work environment exists when a plaintiff is subjected to sexual harassment "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'" *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (citation omitted). Sexual harassment is behavior " 'that would not occur but for the sex of the employee'.... 'If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination.' " *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1537 (10th Cir.1995) (citations omitted)

In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court stated:

Conduct that is not severe or pervasive enough to create an objectively hostile environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

This court, therefore, must determine whether a reasonable jury, considering the admissible evidence as presented by plaintiff in opposition to defendants' motion for summary judgment, could find that the alleged conduct was: 1) gender based or stemmed from sexual animus; and 2) pervasive or severe enough to objectively alter the terms, conditions or privilege of employment. *Gross,* 53 F.3d at 1539 (citations omitted). This determination must be made "in light of the record as a whole' and 'the totality of [the] circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.' " *Id.* at 1537 (quoting *Meritor,* 477 U.S. at 69, 106 S.Ct. at 2406).

In opposition to defendants' summary judgment motion, Gillum presents evidence, in the form of deposition testimony, of numerous instances of Waggoner's conduct which she contends establishes the existence of a hostile work environment. The court will first examine each of these situations for the purpose of determining whether they were gender based or stemmed from sexual animus. The court will then determine whether Waggoner's conduct was pervasive or severe enough to alter the terms, conditions or privilege of employment.

■ Gillum presents evidence showing that Waggoner criticized the quality and quantity of her work. For example, on one occasion Waggoner complained to Gillum's supervisor about alleged errors in her work. On another occasion he complained that she spent too much time making personal telephone calls. He also told others that he could not trust Gillum to do her work. The

Tenth Circuit has held that criticism of an employee's work, without some type of gender-specific reference, is not gender-based conduct. *Gross,* 53 F.3d at 1545–46. Gillum presents no evidence that Waggoner's criticism contained any gender-specific references. Accordingly, a reasonable juror could not properly find that Waggoner's criticism of Gillum's work was gender-based.

■ Gillum alleges that it was sexual harassment for Waggoner to make policies that either contradicted his former policies or contradicted bank policies. However, like her contention that Waggoner's criticism was sexual harassment, she offers no evidence that Waggoner developed these policies because of her gender. Waggoner's decisions may have been misguided, but absent evidence to the contrary, poor management decisions cannot be characterized as gender-based. *See Ballou v. University of Kansas Medical Ctr.,* 871 F.Supp. 1384 (D.Kan.1994).

■ Gillum also presents evidence showing that Waggoner, after becoming her supervisor, forced her to tell him when she went on breaks, followed her to the door of the restroom, and required her to account for her time on detailed forms. Gillum contends that this conduct would not have occurred but for her gender. She argues that "Waggoner's obvious fascination with woman's daily routine . . . is inherently sexual in nature." Gillum presents no evidence, however, other than speculation, that these activities were motivated by sexual animus or gender bias. Indeed, Gillum's coworker, Michele Penry, states in her deposition that the true motivation for this conduct was retaliation for their complaints to Betsworth. As such, this conduct, though offensive, cannot be construed as being motivated by sexual animus or gender bias. Likewise, Gillum's other allegations of retaliation by Waggoner, such as his remark after Bailey's resignation that there was "one down and two to go," and his April 27, 1993, meeting with Gillum and Penry to "clear the air," cannot be characterized as motivated by sexual animus or bias.

■ Gillum cites evidence showing that Waggoner played pranks on her. According to Gillum, Waggoner would sneak up behind her, place his hands on her shoulders and loudly say her name to scare her. In her response, Gillum states that she does not characterize these acts as "sexual acts per se," but argues they nevertheless constitute sexual harassment because "they illustrate Waggoner's male dominance over female employees in captive situations." The court disagrees. Gillum presents no evidence, other than speculation, that these activities were motivated by sexual animus or gender bias. Gillum also fails to provide legal support for her "male dominance" theory, and the court is not persuaded to construe what appears to be gender-neutral buffoonery as a demonstration of "male dominance" over "captive" female employees. The fact that Gillum may have been "isolated and alone" in her work cubicle or "captive" in Waggoner's car does not convert gender-neutral pranks or mere offensive behavior into conduct motivated by sexual animus or gender bias.

■ Gillum next opposes defendants' summary judgment motion by offering evidence of Waggoner's offensive comments and outbursts. Gillum complains that Waggoner often yelled at Betsworth for her errors, that he demeaned Betsworth behind her back, and said that all women in the safekeeping department were "dumb" and that his wife was "ignorant." Gillum also complains about Waggoner's use of the term "gals" to refer to the women in his department. Betsworth testified that Waggoner yelled at her and she yelled at him, but she never felt he was abusive to her. While such antics may contribute to an offensive or even "hostile" environment, there is no evidence that this hostility derived from some gender-based animosity or bias. The Tenth Circuit has held that criticism of an employee's work, without some type of gender-specific reference, is not gender-based conduct. *Gross,* 53 F.3d at 1545–46. Additionally, "dumb" is a gender neutral term since it can apply equally to both sexes. *Id.* at 1543; *Young v. Finish Line, Inc.,* 1995 WL 472783 at * 5 (D.Kan.). This reasoning also applies to Waggoner's use of the term "ignorant." Significantly, Michele Penry stated in her deposition that Waggoner's use of the term "dumb" to refer to the women in the safe-

keeping department was not due to sexual animus, but was an example of his general tendency of excusing his own mistakes by shifting blame to other parties. Finally, Gillum presents no evidence that Waggoner's use of the term "gals" stemmed from sexual animus. According to Waggoner, he used the term out of habit, not out of sexual animus. Moreover, it appears that it was not the term itself that offended Gillum, but that it was used by Waggoner. Gillum stated that she was not offended when her prior female supervisor referred to her and other collateral department employees as "her girls."

■ Gillum also complains about Waggoner's angry behavior directed toward Michele Penry. In April 1993, Penry and Waggoner disagreed over an irregular transaction in the file of a member bank for which she was responsible. When Penry kept insisting that the irregularity was not a mistake, Waggoner, while seated at his desk, shouted to "just sit down and shut up a minute." Penry, afraid that he would "come up out of the chair," exited his office and he followed her shouting "Michele, you're insubordinate. I don't have to take this off of you." Although Waggoner's outburst may have been rude and unprofessional, Gillum has made no showing that this outburst would not have occurred but for her gender. Gillum presents no evidence that Waggoner physically threatened either woman other than Penry's statement that she believed "he might come up out of the chair" and that he had a "glazed look in his eye like he was crazy." There is evidence, however, that Waggoner's hostility was motivated by his belief that Penry was not properly doing her job. As such, "Title VII ... does not give a woman immunity from being reprimanded in the presence of her co-workers if her supervisor believes that she has violated work rules or has been negligent in performing her job." *Gross*, 53 F.3d at 1545–46.

■ Gillum next complains that on an out-of-town trip, Waggoner, while at dinner with Gillum, ordered mixed drinks called "sex on the beach" and " 'cum' in a hot tub." Gillum presents no evidence that Waggoner made any sexual overtures toward her or any sexual comments other than to order the drink. As such, merely ordering a drink with a vulgar name, while crude behavior in a business setting, does not demonstrate sexual animus or gender bias. Waggoner's November 1991 reference to the Crossroads Mall in Nebraska as looking like "two hooters" or as the "bra bazaar" or the "boobs up" mall is similarly crude and impolite. Nevertheless, the court is not convinced that Waggoner would not have made these remarks but for Gillum's gender. To the contrary, it seems likely, in light of Gillum's testimony regarding Waggoner's conduct, that he would have made the same remark to any associate, male or female, he may have been traveling with at the time. Again, while such conduct in a business environment might demonstrate a certain degree of baseness, it does not demonstrate sexual animus or gender bias, and Gillum presents no evidence to the contrary.

■ Gillum argues that Waggoner's reckless driving, his comment to Gillum that she already looked "dressed down" for "dress down" day, and his pointing an oil-can at Sonia Betsworth when posing for a Halloween party picture while dressed as a character from the Wizard of Oz, resulted from gender bias or sexual animus. She also argues that Waggoner's remark that his wife was stupid, his demand that Gillum complete her work in his hotel room, and his insistence that he and Gillum dine at a "Hooters" restaurant while out of town were gender-based. The court finds no evidence, however, from which a reasonable fact-finder could properly accept these arguments. While Wagoner's conduct in some of these situations may have been less than professional, it does not, standing alone, demonstrate gender bias or sexual animus. Likewise, Waggoner's comment about sleeping with a woman of Gillum's age while on a camping trip may have been rather crude, but Gillum offers no evidence that Waggoner inquired into her sex life or made any sexual overtures to her. Without evidence that Wagoner made this comment because of Gillum's gender, Waggoner's conduct does not demonstrate gender bias or sexual animus.

■ Gillum also contends that Waggoner's advice to her that she walk to lose weight off her hips and his yelling to Gillum's co-worker, Sherri Bailey, to "get your buns over here" are inherently gender-based. The court disagrees. In *Gross*, the Tenth Circuit held that telling a co-worker to "get [her] ass back in the truck" did not demonstrate gender discrimination because "ass" refers to a portion of human anatomy shared by both sexes. The same rationale applies to Waggoner's use of the terms "hips" and "buns." Gillum's argument that the *Gross* court's holding is limited to the construction site context is unpersuasive. Once again, Waggoner's conduct may have been crude and offensive, but Gillum presents no evidence to support a finding that it resulted from gender bias or sexual animus.

■ Gillum next complains about three occasions where she arrived with Waggoner at their hotel to find that only one room had been reserved. According to Gillum, on these occasions she would have to ask the hotel clerk for a separate room. This made Gillum "extremely scared" because when she requested separate rooms, Waggoner "said nothing as if waiting for her response as to whether she was going to stay with him." Gillum contends that Waggoner intentionally orchestrated these oversights because he enjoyed watching her ask for another hotel room and that these incidents were gender-based conduct designed to humiliate and degrade her. Such conduct, if it were in fact intentional, might arguably be considered gender based. However, Gillum presents no evidence to support her claim that Waggoner intended to cause the hotel room mix-ups. To the contrary, Gillum states in her deposition that she did not know what led the hotel clerks to believe she and Waggoner did not have separate rooms. She also stated that she did not know who made the room reservations, and she offers no evidence to show that Waggoner was responsible. In fact, based on defendant's deposition evidence, it appears that Sally Zeigler, the collateral review assistant, was responsible for the hotel reservations.

Gillum complains that in March 1991, she overheard Waggoner remark to a male co-worker that he had permission to get into the drawers of another female worker, possibly Michele Penry. Defendants contend that even if Waggoner had intended a sexual meaning, there is no evidence to suggest that he made this comment because of Gillum's gender because he was not aware she could overhear him. Gillum argues that Waggoner's comment was actually directed at her because he knew or should have known he could easily be overheard because of the proximity of her work station. As to this comment, the court believes a reasonable jury could find that it was gender based or resulted from sexual animus.

Gillum further complains that every time she was alone with Waggoner, he would touch her arm or hands with his arms. She offers no evidence, however, other than her inference of Waggoner's intent, to show these contacts were anything more than inadvertent. Nevertheless, for purposes of this summary judgment motion, this "arm touching" will be construed as being motivated by gender bias or sexual animus.

Finally, Gillum claims the evidence shows four incidents of unwanted physical contact by Waggoner, all of which she contends resulted from sexual animus or gender bias. The first incident occurred in January 1991. Gillum states that while she and Waggoner were working together she asked him a question about a document and that when he came over to view it he leaned against her. The second incident, which occurred in December 1992, is similar to the first. Gillum states that Waggoner was looking over her shoulder while she was working and that she felt some part of his body touch her shoulder. She also claims that she knew Waggoner was sexually aroused because she could hear his breathing. The third incident occurred in March 1993 when Waggoner came into a file room and brushed against Gillum as he passed behind her. Lastly, Gillum complains of a May 1993 incident in which Waggoner squeezed himself between her and her computer so that he was able to look into her shirt and that she felt his pelvis touch her shoulder.

The court notes that Gillum presents little or no evidence supporting her claim that

these incidents demonstrate something more than inadvertent or incidental touching. However, for purposes of this summary judgment motion, they will be construed as resulting from gender bias or sexual animus. Likewise, the court will assume, notwithstanding some evidence to the contrary, that Gillum subjectively perceived each of these incidents as sexually motivated at the time they occurred.

The next question is whether Waggoner's conduct was pervasive or severe enough to objectively alter the terms, conditions or privilege of Gillum's employment. The Supreme Court said this standard is the middle ground between one that makes merely offensive conduct actionable and a standard that requires a psychological injury. *Harris,* 510 U.S. at 22, 114 S.Ct. at 370–71. A "mere utterance of an ... epithet which engenders offensive feelings in an employee," *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405, "does not impact a condition of employment and, therefore, does not implicate Title VII." *Harris,* 510 U.S. at 21, 114 S.Ct. at 370. On the other hand, Title VII becomes an issue before the employee suffers a nervous breakdown. *Id.* at 22, 114 S.Ct. at 370–71. Circumstances to consider in each case include: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* Only that conduct which the court has found to be discriminatory, i.e., resulting from gender bias or sexual animus, will be considered at this stage of the inquiry. *See Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir.1994) ("General harassment if not racial or sexual is not actionable.").

The evidence suggests that Waggoner made one gender based comment and engaged in four specific acts of unwanted physical contact between January 1991 and May 1993, all of which are deemed to have stemmed from gender bias or sexual animus. Also during this time, Waggoner periodically touched Gillum on her arms or hands with his arms in a manner characterized by plaintiff as "slow and meaningful." The court is not convinced, however, that a reasonable jury, considering all of the circumstances of this case, could find Waggoner's conduct to have created an objectively hostile work environment that altered the conditions of plaintiff's employment. None of Waggoner's conduct was physically threatening and Gillum does not allege any unwelcome sexual advances. Nor does Gillum allege that Waggoner engaged in any sexually suggestive touching or groping. "Actual physical contact .... is not a touchstone triggering the applicability of Title VII." *McCrackin v. LabOne, Inc.,* 903 F.Supp. 1430 (D.Kan.1995). *See Ebert v. Lamar Truck Plaza,* 878 F.2d 338 (10th Cir.1989) (affirming district court finding that alleged unwelcome touching was sparse and not pervasive); *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210 (7th Cir.1986) (plaintiff's working environment was held not to be sufficiently hostile, even though she had been slapped on the buttocks). "In cases where courts have found physical contact to constitute harassment, the conduct has usually been much more egregious." *See, e.g., Campbell v. Kansas State University,* 780 F.Supp. 755, 762 (D.Kan.1991) (defendant's conduct in slapping plaintiff's buttocks was "patently abusive"); *Ulrich v. K–Mart Corp.,* 858 F.Supp. 1087, 1091 (D.Kan.1994) (co-worker repeatedly grabbed plaintiff, pressed against her, felt her breasts, and placed his hands between her legs). Considering the totality of the circumstances as presented and supported by the evidence, the incidents of misconduct in this case resulting from sexual animus or gender bias were relatively isolated and were not severe or pervasive enough to create an environment that a reasonable juror could properly find hostile and abusive. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370. Accordingly, defendants are entitled to summary judgment on plaintiff's sexual harassment claim.

## B. Retaliation

To establish a prima facie retaliation claim under Title VII, a plaintiff must show "(1) protected opposition to Title VII discrimination or participation in a Title VII proceeding; (2) adverse action by the employer subsequent to or contemporaneous with such employee activity; and (3) a causal

connection between such activity and the employer's adverse action." *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 985 (10th Cir.1996). "The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.,* 683 F.2d 339, 343 (10th Cir.1982). Once a plaintiff succeeds in establishing a prima facie case of retaliation, the burden shifts to the employer to proffer legitimate, nondiscriminatory reasons for the adverse action. *Berry,* 74 F.3d at 986. If the employer sets forth legitimate nondiscriminatory reasons for the adverse action, the plaintiff must then establish that the defendant's reasons are merely a pretext for retaliation. *Id.* "The overall burden of persuasion remains on the plaintiff." *Sauers v. Salt Lake County,* 1 F.3d 1122, 1128 (10th Cir.1993).

█ Defendants argue that Gillum fails to establish a prima facie case of retaliation because she provides no evidence of adverse action by FHLB. As the court noted in *Jeffries v. State of Kan., Dept. of Social and Rehabilitation Services,* "courts liberally define an adverse employment action." 946 F.Supp. 1556, 1567 (D.Kan.1996) (citing *Berry,* 74 F.3d at 986). " '[A]dverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well.' " *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir.1996) (quoting *Collins v. State of Ill.,* 830 F.2d 692, 703 (7th Cir.1987)). However, the *Jeffries* court noted, while adverse job actions cover more than measurable losses of salary or benefits, "not everything that makes an employee unhappy is an actionable adverse action." *Smart,* 89 F.3d at 441. To be actionable, the adverse employment action must be "material":

"[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices that might be unique to a particular situation."

*Rabinovitz v. Pena,* 89 F.3d 482, 488 (7th Cir.1996) (quoting *Crady v. Liberty Nat'l Bank & Trust,* 993 F.2d 132, 136 (7th Cir. 1993)).

The *Jeffries* court set out several examples of adverse employment actions, including decisions that have a demonstrable adverse impact on future employment opportunities or performances; demotions, adverse or unjustified evaluations and reports; transfer or reassignment of duties; failure to promote; and unfavorable letters of reference to prospective employers. *Jeffries,* 946 F.Supp. at 1567 (citations omitted). These examples of adverse employment action are consistent with the general notion that " '[a]n adverse action is one that affects the terms, privileges, duration, or conditions of employment.' " *Yerdon v. Henry,* 91 F.3d 370, 378 (2nd Cir.1996) (quoting *Johnson v. Frank,* 828 F.Supp. 1143, 1153 (S.D.N.Y.1993)).

█ Gillum alleges that she was subjected to retaliation for reporting her claims of sexual harassment by the following: 1) Waggoner treated her less favorably than he treated other employees; 2) Waggoner required her to report to him when she was going on break; 3) Waggoner called Gillum and Penry into his office and told them they should not have gone outside the department with complaints and threatened to fire them; and 4) on February 17, 1993, shortly after one of Penry's co-workers resigned, Waggoner stated to another of Penry's co-workers "well, there's one down and two to go." Noticeably lacking from these disagreeable events is any "adverse employment action," as defined above, following or contemporaneous with her complaint. The court thus finds that defendants are entitled to summary judgment on plaintiff's retaliation claim.

**C. Constructive Discharge**

█ To establish constructive discharge, plaintiff must demonstrate that defendant, by its illegal discriminatory acts, made working conditions so difficult that a reasonable person in her position would feel compelled to resign. *Daemi v. Church's*

*Fried Chicken,* 931 F.2d 1379, 1386 (10th Cir.1991). This standard is applied objectively; the plaintiff's subjective views are irrelevant to the inquiry. *Irving v. Dubuque Packing Co.,* 689 F.2d 170, 172 (10th Cir. 1982). "The intolerable conditions necessary for a constructive discharge claim must be the result of the employer's discriminatory acts, not plaintiff's general discontent with the insensitivity of her fellow employees." *Stalnaker v. KMart Corp.,* 950 F.Supp. 1091, 1097 (D.Kan.1996) (citing *Hirschfeld,* 916 F.2d at 580). Moreover, a finding of hostile work environment does not compel a finding of constructive discharge. *Campbell,* 780 F.Supp. at 765.

▮ Gillum bases her constructive discharge claim on the same incidents of Waggoner's conduct upon which she bases her hostile work environment claim, and which are fully discussed above. The court finds, however genuine plaintiff's distress, Waggoner's conduct cannot be reasonably described as creating an intolerable working environment. Accordingly, defendants are entitled to summary judgment on plaintiff's constructive discharge claim.

### D. Intentional Infliction of Emotional Distress

▮ Defendants seek summary judgment on Gillum's intentional infliction of emotional distress claim. To establish a claim of intentional infliction of emotional distress, commonly referred to as the tort of outrage, a plaintiff must demonstrate four elements: (1) the conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe. *Moore v. State Bank of Burden,* 240 Kan. 382, 729 P.2d 1205, 1211 (1986) (citing *Hoard v. Shawnee Mission Medical Center,* 233 Kan. 267, 662 P.2d 1214 (1983)). For Penry's claim to survive summary judgment, the court must, as a matter of law, first determine that reasonable fact finders might differ as to: (1) whether defendant's conduct may reasonably be regarded as so extreme and outrageous as

to permit recovery, and (2) whether plaintiff's emotional distress was so extreme and severe that the law must intervene because no reasonable person should be expected to endure it. *Id.* (citing *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175, 1179 (1981)). Conduct is not extreme and outrageous unless it is regarded as being "beyond the bounds of decency and utterly intolerable in a civilized society." *Id.* The threshold requirements for outrage causes of action are "necessarily high to separate meritorious claims from those based on trivialities or hyperbole." *Rupp v. Purolator Courier Corp.,* 790 F.Supp. 1069, 1073 (D.Kan.1992) (citing *Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260, 1261–62 (D.Kan.1984)).

▮ Intentional infliction of emotional distress "is not a favored cause of action under Kansas law." *Beam v. Concord Hospitality, Inc.,* 873 F.Supp. 491, 501 (D.Kan. 1994) (quoting *E.E.O.C. v. General Motors Corp.,* 713 F.Supp. 1394, 1396–97 (D.Kan. 1989)). "The Kansas courts have been reluctant to extend the outrage cause of action to discrimination claims, including claims of sexual harassment, arising in the employment setting." *Id.* (quoting *Laughinghouse v. Risser,* 754 F.Supp. 836, 843 (D.Kan.1990)). The existence of a hostile work environment sufficient to support a Title VII does not necessarily require a finding of outrageous conduct. *See, e.g., Varley v. Superior Chevrolet Automotive Co.,* 1997 WL 161942, *16 (D.Kan.); *Anspach v. Tomkins Indus., Inc.,* 817 F.Supp. 1499, 1507 (D.Kan.1993), *aff'd,* 51 F.3d 285 (10th Cir.1995).

The few cases in which courts have permitted outrage claims to survive summary judgment motions have involved repeated physical threats and racially or sexually abusive language. *See, e.g., Laughinghouse,* 754 F.Supp. at 836; *Gomez v. Hug,* 7 Kan.App.2d 603, 645 P.2d 916 (1982). In *Laughinghouse,* the plaintiff was the victim of sexual harassment and abuse from her supervisor described as "a concerted effort to terrorize her and to intentionally break her spirit." 754 F.Supp. at 843. Such harassment and abuse took the forms of screaming, cursing, sexual comments and unwanted touching, fits of rage which included tearing up files and

throwing things, threats of termination and other tactics. *Id.* Evidence in that case indicated that the defendant mounted a concerted effort to terrorize the plaintiff and to treat her "like an animal." *Id.* Similarly, the defendant in *Gomez* subjected the plaintiff to vulgar, racist expressions and threats of violence resulting in potentially serious medical problems. 645 P.2d at 918.

■ Defendants contend that summary judgment is warranted for Gillum's intentional infliction of emotional distress claim because, even viewing the facts in the light most favorable to plaintiff, the facts do not demonstrate conduct so extreme or outrageous as to permit recovery under the tort of outrage. The incidents upon which plaintiff bases her claim are those same incidents upon which she bases her Title VII claim, and which are fully discussed above. In determining whether Waggoner's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery for the tort of outrage, however, the court is not limited to considering only that conduct resulting from gender bias or sexual animus. The court may instead consider all of Waggoner's conduct which Gillum alleges supports her claim.[1] Nevertheless, the court is not persuaded that a reasonable fact finder could find Waggoner's behavior so outrageous that it transcends the bounds of decency and is utterly intolerable in a civilized society. Unlike the defendant's conduct in *Laughinghouse or Gomez*, Waggoner's conduct did not include threats of physical violence. Nor did Waggoner's conduct include unwelcome sexual advances or sexually offensive touching or groping. Granted, the evidence presented by Gillum paints a less than flattering picture of Waggoner, but his behavior was not so extreme and outrageous as to sustain a claim for intentional infliction of emotional distress.

■ Likewise, FHLB's conduct in responding to Gillum's complaints cannot be described as "beyond the bounds of decency and utterly intolerable in a civilized society." FHLB had a policy against sexual harassment that was set forth in its employee handbook; it had procedures in place to allow Gillum to bypass Waggoner in reporting grievances; and it responded in some manner to all of Gillum's complaints about Waggoner's conduct. In *Anspach,* the court described the employer's efforts to stop harassment of the plaintiff as "woefully inadequate" because the harassment in fact increased in response. 817 F.Supp. at 1507. Still, the *Anspach* court held that, as a matter of law, the employer's conduct was not so extreme as to sustain a claim for intentional infliction of emotional distress. In contrast to the employer's response in *Anspach,* FHLB's response to Gillum's complaints was far more effective.

The defendants' conduct may not reasonably be regarded as so extreme and outrageous as to be considered "beyond the bounds of decency and utterly intolerable in a civilized society." Accordingly, the court grants summary judgment in favor of defendants on plaintiff's claim of intentional infliction of emotional distress.

**IT IS THEREFORE BY THE COURT ORDERED** that defendants' Motion for Summary Judgment (Doc. 26) is granted.

---

1. The court does not agree with Gillum's argument that it should consider Waggoner's misconduct toward her co-workers as support for her intentional infliction of emotional distress claim.