Johnna C. ANTLE, Plaintiff,

v.

BLUE CROSS AND BLUE SHIELD OF KANSAS, INC., and Joe DeWerff, Defendants.

No. 98–1169–WEB.

United States District Court, D. Kansas.

Oct. 29, 1999.

Daniel J. Sevart, Sevart & Sevart, Wichita, KS, for plaintiff.

Jane Chandler Holt, Blue Cross and Blue Shield of Kansas, Inc., Topeka, KS, Stephanie N. Scheck, Morrison & Heckler, L.L.P., Wichita, KS, Alan L. Rupe, Dwight David Fischer, Husch & Eppenberger, Wichita, KS, for defendants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

Plaintiff Johnna Antle, a 43–year–old former employee of defendant Blue Cross and Blue Shield of Kansas, brought this action alleging claims of unlawful age and sex discrimination and retaliation against Blue Cross. She also asserts a claim for intentional infliction of emotional distress against Blue Cross and Joe DeWerff, her former supervisor. The matter is now before the court on the defendants' motion for summary judgment. The court finds oral argument would not assist in deciding the issues presented.

### I. *Facts.*

In keeping with the standards governing summary judgment, the following facts are either uncontroverted or, when controverted, are viewed in the light most favorable to the plaintiff.

1. Joe DeWerff hired plaintiff Johnna Antle on July 26, 1993, as a sales representative for Blue Cross and Blue Shield of Kansas, Inc. (hereinafter "Blue Cross").

2. Plaintiff replaced Michael Lank, who transferred to Blue Cross's Salina office. Lank's exit interview included his statements that DeWerff "[h]as a good handle on what is necessary to be successful in the business. Offers good input; however he seems to be afraid to show trust in his employees. He is sometimes too strict and often creates stress that is in addition to the normal stress related to the job." Lank also wrote the following on the exit interview: "I know that there has been high turnover in the Pittsburg region some of it directly related to high tension relations with Joe DeWerff. I did not leave because of Joe, I left because of earning potential; however, I feel that Joe's strict, untrusting attitude may continue to create unnecessary stress within the region. Joe has the knowledge to be a good manager; however, his management style may be lacking." Lank was classified as eligible for rehire by DeWerff.

3. Echlin is a national corporation headquartered in Connecticut that also has facilities in Kansas. In the fall and winter of 1996, the Blue Cross organization that serviced Echlin's Connecticut headquarters was preparing a "global" proposal to Echlin to cover all of its facilities nationwide. Mike Kelly, National Account manager for Blue Cross and Blue Shield of Kansas, was assisting with the efforts of the Blue Cross organization preparing this global proposal.

4. In December 1996, the global proposal for Echlin began to fall through. As a result, defendant Blue Cross asked Kelly to contact the Blue Cross organization servicing Echlin's corporate headquarters to see if the defendant could make a proposal on the local level. At this stage, no proposals had been drafted or submitted to Echlin through defendant, as this was a national account originating outside of Kansas.

5. Andy Corbin is defendant's Director of External Sales and is DeWerff's super-

visor. At Corbin's suggestion, Mike Kelly listed Brian Karleskint as the responsible sales representative on defendant's Echlin proposal. Corbin testified that he did so because of Karleskint's experience in working with actuarial science and his experience working with multiple brokers. Corbin testified that this was done on an interim basis until DeWerff made a final decision as to who would be the sales representative. Corbin made this suggestion before he spoke to DeWerff concerning who would be assigned to the account.

6. Plaintiff Johnna Antle had an Echlin facility, Automotive Controls, located in her region. Another Echlin facility, Midland Brake, was located in Brian Karleskint's region. Automotive Controls had over 800 employees; Midland Brake had approximately 300 employees. Plaintiff had worked on the Automotive Controls account several times. She had spent a total of approximately nine hours on the account over a three-year period.

DeWerff was faced with two potential accounts in two different regions with two different salespersons. William Mercer from Echlin's national brokerage house made it clear that Echlin wanted only one salesperson calling on these accounts, which were self-funded; therefore, DeWerff had to make a decision between plaintiff and Karleskint.

7. Karleskint had previously worked for Blue Cross and Blue Shield of Texas where most accounts were sold through brokerages; he also had experience with self-insured accounts, consultants, and agent brokers.

8. In January 1997, DeWerff made the decision to assign the Automotive Controls account from plaintiff to Karleskint. DeWerff testified that he did so because of Karleskint's greater experience, and because he viewed Karleskint as the best person to represent defendant.

9. Thus, defendant had only one salesperson calling on the prospective accounts, as required by William Mercer.

10. On January 9, 1997, DeWerff notified plaintiff of his decision that Karleskint would be assigned the Echlin accounts.

11. On January 10, 1997, DeWerff explained the details of his reasoning to plaintiff. When plaintiff questioned the decision to give the account to Karleskint, DeWerff discussed with plaintiff his concern that "if she would continue to push the issue," defendant could lose the account to the national office, as DeWerff had been warned by Andy Corbin.

12. It is not an unusual practice at Blue Cross and Blue Shield of Kansas for an account to be reassigned, although it was unusual for an account located in one representative's area to be assigned to a representative for another area. Plaintiff had previously benefitted from reassignment when the Wolf Creek account, which had initially been enrolled through a different representative, was reassigned to plaintiff. This was done when the entire county was transferred to plaintiff. Also, accounts within Coffey County, Kansas, had been previously reassigned from Karleskint to plaintiff when that county was transferred to her. At the same time, Karleskint took over Linn County from Stephen Kaspar.

13. On January 13, 1997, plaintiff informed Joy Hill, EEO Coordinator for Blue Cross and Blue Shield of Kansas, that she would like to file an internal complaint of sex discrimination. Plaintiff said nothing about age discrimination.

14. On January 14, 1997, plaintiff called in sick to Hill and to DeWerff's secretary, Rita Ortolani. On January 14, 1997, Hill received a letter from Allen D. Gillis, D.O., stating that plaintiff required two weeks off of work due to acute anxiety secondary to job stress.

15. On January 16, 1997, Joy Hill wrote a letter to plaintiff stating that her request for Family Medical Leave Act (FMLA) leave was not being approved because her condition did not meet the definition of "serious health condition" in that she was not under the "continuing treatment of a health care provider" as required by FMLA regulations.

16. On January 20, 1997, Dr. Gillis informed Hill by fax that plaintiff was currently taking Xanax and Paxil for anxiety and depression due to stress secondary to work-related problems and that plaintiff was also seeing a counselor at Four County Mental Health. After receiving this information, Hill sent revised FMLA papers to plaintiff on January 21, 1997, approving her request for leave.

17. The next day, January 21, 1997, Hill notified plaintiff by memo that she did not believe that the decision to assign the Echlin account to Karleskint was based on sex discrimination. Hill also recommended that plaintiff and DeWerff have a meeting attended by a facilitator to discuss issues and expectations.

18. On January 24, 1997, plaintiff sent a memo to Hill stating, among other things, that she did not agree with the results of the investigation and that the topics should be revisited.

19. On January 29, 1997, defendant received a letter from Dr. Vicki O'Brien of Four County Mental Health Center stating that plaintiff was currently under her care and that of Dr. Reddy. The treatment plan included both medication and individual therapy, and recommended that plaintiff be off of work until after February 28, 1997.

20. On February 12, 1997, Hill sent a memo to plaintiff informing her that she had spoken to DeWerff, Corbin, Karleskint and Rita Ortolani regarding the decision to transfer the ACC/Echlin account. Hill informed plaintiff that, based on her investigation, she had found no evidence or suggestion that the decision was the result of

sex discrimination. Hill determined that the account was transferred for legitimate business reasons. At this point, Hill stated that she would arrange a facilitator to meet with plaintiff and DeWerff due to the communications problems.

21. On February 27, 1997, Hill received a letter from Vicki O'Brien with County Mental Health stating that plaintiff had an appointment on March 7, 1997, and would then be released to return to work on March 10, 1997.

22. On February 28, 1997, Hill received a letter from Allen D. Gillis, D.O. that plaintiff would be released to return to work on March 10, 1997.

23. On March 13, 1997, DeWerff sent Corbin a memo that contained his analysis and recommendations for changes for the Pittsburg Region as part of the reorganization discussed *infra*. DeWerff recommended that plaintiff remain in the Independence, Kansas, office.

24. On March 17, 1997, plaintiff and DeWerff met with the mediator, as had been arranged by Hill, in an attempt to resolve the issues between the two of them.

25. On April 9, 1997, plaintiff filed a complaint with the Kansas Human Rights Commission.

26. On April 18, 1997, plaintiff called in sick to Hill, and defendant received a note from Four County Mental Health Clinic that plaintiff "will now be able to return to work on April 28, 1997."

27. During the spring of 1997, the Marketing Division of defendant Blue Cross went through a major reorganization. Prior to this reorganization, defendant had four Regional Offices (Topeka, Wichita, Hutchinson, and Pittsburg) with District Offices in Independence and Salina. After the reorganization in April 1997, the Pittsburg office became a District Office, leaving three Regional Offices.

28. Andy Corbin made the final decisions regarding this reorganization. At Corbin's request, DeWerff had made recommendations about the reorganization, some of which differed from what Corbin's final plan provided. For instance, DeWerff recommended that plaintiff remain in the Independence office.

29. The reorganization plan called for both DeWerff and plaintiff to be transferred to Wichita. DeWerff was to fill the position that had been left open by the prior departure of Karen Cox, and plaintiff was to fill the opening previously left by Terrance Phox's March 1, 1997, resignation.

30. DeWerff did not make the final decision regarding the reorganization of the regions. DeWerff had previously proposed a reorganization plan in response to Andy Corbin's request; however, due to legitimate business concerns, DeWerff's plan was not implemented.

31. Since 1988, defendant had consolidated from five regions to four and ultimately to three regions. During this time, several district offices were closed or consolidated, including Winfield, Concordia, Chanute and Coffeyville.

32. On April 9, 1997, Corbin met with the Regional Managers to discuss the reorganization; it was at that time that DeWerff was informed that plaintiff was to be transferred.

33. On April 18, 1997, Corbin and the Regional Managers traveled around the state to deliver news regarding the statewide reorganization. DeWerff went to plaintiff's office to advise her of the reorganization, but she had called in sick to Hill. After leaving several messages for plaintiff, which she did not return, DeWerff left another message for plaintiff at 1:30 p.m. regarding the reorganization and the "good opportunity" she was being offered in Wichita.

34. Plaintiff did not call DeWerff until April 21, 1997. When she called on that date, DeWerff informed plaintiff that she was to let him know whether or not she wanted the job in Wichita by 3:30 p.m. on April 22, 1997.

Plaintiff did not call DeWerff back even though he had provided her with his mobile phone number in Wichita where he could be reached. When plaintiff failed to accept the transfer to Wichita, defendant Blue Cross considered that she had voluntarily terminated her employment.

35. On May 2, 1997, plaintiff called Joy Hill to inquire about the company's Severance and Retention Benefit Plan. In relevant part, the Severance and Retention plan provided generally that a benefit would be paid to employees whose jobs had been eliminated, but not if employment ended because of voluntary termination. Hill told plaintiff she was not eligible for this benefit because she had voluntarily terminated employment in that "[y]ou had a job in Wichita which you refused."

36. In September 1997, plaintiff spoke with and wrote Hill to inquire about "re-

call" benefits, as to whether she could be hired for the position that had been vacated by Brian Karleskint. Hill responded to plaintiff that she was not eligible for recall benefits because her position had not been eliminated, she had voluntarily terminated her employment.

37. DeWerff sent plaintiff a birthday card in January of 1997 that read something to the effect of "Happy Birthday to a person who's been around the block a few times ... but don't worry—lots of people your age forget where they live now and then."

*Plaintiff's Additional Statement of Facts.*[1]

38. In 1995, plaintiff had a hysterectomy, and DeWerff called her at her home, asking about her condition. During the conversation, he asked plaintiff, "How is your husband doing?" Plaintiff responded, "Well, okay. Why do you ask?" He said, "I have heard about women and those hormones, I feel sorry for him."

39. On another occasion, DeWerff telephoned for plaintiff at her desk when she was in another part of the office. Plaintiff ran to take the call and was out of breath

---

1. Several of plaintiff's additional facts have been deleted from the court's statement because they contain conclusions with no supporting facts. For example, plaintiff states that "DeWerff belittled her, her efforts and her work, and talked down to her and other female employees as females"; "DeWerff verbally abused plaintiff whenever she asked for an explanation"; "male employees were not similarly treated, and especially not those who were younger than plaintiff"; "When plaintiff questioned the decision to give the account to the younger male worker, defendant DeWerff gave her several pretextual reasons which were easily rebuttable"; and "In retaliation against plaintiff, defendant Blue Cross denied the request upon pretextual bases, ..." Such conclusions and characterizations cannot defeat summary judgment. *See Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir.1990) (conclusory allegations without specific supporting facts have no probative value). Additionally, plaintiff cites to the Pretrial Order as authority for several assertions. Rule 56 requires the responding party to iden-

tify an evidentiary basis for her allegations. *See* Fed.R.Civ.P. 56, Adv.Comm. Note ("The very purpose of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."). Plaintiff also cites her KHRC complaint as authority for some assertions. Although a verified complaint may, in some circumstances, be treated as an affidavit for purposes of summary judgment, in order to do so the pleader must demonstrate personal knowledge of the specific facts alleged. Unlike a complaint, which may be based merely upon information and belief, affidavits used on summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *See* Fed.R.Civ.P. 56(e). Plaintiff's citation of her KHRC complaint fails to meet these requirements.

when she answered, and DeWerff asked what was wrong with her. Plaintiff responded that she ran to answer the call, to which DeWerff said, "Wow, Johnna, that is what happens when you get old."

40. On another occasion, plaintiff injured her back and had to seek medical attention. She called DeWerff to get permission to take time off. She explained what had happened and DeWerff said, "That comes with age, Johnna."

41. The ACC account on which plaintiff had worked could have brought plaintiff a commission of nearly $10,000 or more. When plaintiff questioned the decision to give the account to Karleskint, DeWerff told her she better drop the subject or suffer the consequences because she would be affecting his pocketbook if she caused his region not to get the commission.

42. Plaintiff filed her initial complaint of discrimination with the KHRC and EEOC on April 9, 1997. Blue Cross was aware prior to that time that plaintiff had complained internally of discrimination. On or about April 21, 1997, plaintiff was informed by DeWerff that her position in Independence was being eliminated, and she was given the option of continuing in a similar position in Wichita. DeWerff told plaintiff that he needed to know by the end of the day on April 22nd whether she would accept the job in Wichita. Plaintiff's family, as was known to Blue Cross, resided in Coffeyville, Kansas, in the same county as Independence. Plaintiff chose not to accept the position in Wichita, which was over 100 miles from her family home, and was terminated by Blue Cross on April 22, 1997.

43. Two other employees in Blue Cross's Independence office were also terminated. Both were female, and both were 52 years of age. Joe DeWerff had to move to Wichita in order to maintain his job.

44. Blue Cross denied severance pay to plaintiff. It granted severance pay to the two employees who were not given the opportunity to continue their employment with Blue Cross.

45. Although Blue Cross only gave plaintiff the option of moving to Wichita or being terminated, it did continue to employ some individuals in Independence.

46. On a brokered account, a broker solicits the sale and works directly with the proposed group during the solicitation process, while on a non-brokered account the account representative works directly with a group.

47. During her employment with Blue Cross, and under the supervision of DeWerff, plaintiff was assigned and worked at least 32 self-funded accounts, plus the Automotive Controls Account, which was expected to be self-funded while she worked it.

48. According to Brian Karleskint, he had worked 14 self-funded accounts with defendant. Prior to the ACC account, he dealt with only two or three brokered accounts in Kansas. Prior to that, he had experience working brokered and self-funded accounts for Blue Cross and Blue Shield of Texas.

49. DeWerff never searched Karleskint's office.

50. At the time of his deposition on March 1, 1999, Karleskint was 36 years of age.

51. Karleskint had looked into a position with Blue Cross in Wichita, and had applied for a position with the company in Topeka.

52. When Karleskint quit working for Blue Cross, he gave notice by submitting a resignation letter on September 3, 1997, with an effective date of September 15, 1997. Although he remained employed until the 15th, he was not at work from the 4th through the 15th. Karleskint's exit interview form indicates that he is eligible

for rehire with Blue Cross. Plaintiff's exit interview indicates that she is not eligible for rehire. According to Andrew Corbin, this is because plaintiff terminated without two weeks' notice.

53. The gross commission received by Karleskint from the sale of the ACC account was around $9,500.

54. Plaintiff won the company's state-wide President's Award the year after Karleskint won it.

55. Karleskint was hired by Blue Cross in February of 1992.

56. The Blue Cross *Highlights* newsletter for the week of December 30, 1996, indicated that Automotive Controls Corporation was assigned to plaintiff.

57. Plaintiff was evaluated by DeWerff several times. In those evaluations, plaintiff frequently scored at or near the maximum in categories based upon objective criteria. In categories in which DeWerff had some discretion, she often scored lower.

58. Plaintiff received a 9.7% pay raise in November or December of 1996.

59. Plaintiff was defendant's top performer in the state in health insurance sales in 1995. She won numerous awards during her Blue Cross employment.

60. Plaintiff and Karleskint were comparable in terms of the number of awards each had received.

61. DeWerff and Andy Corbin knew that plaintiff had been off on FMLA leave and under treatment at Four County Mental Health.

62. The job that plaintiff was offered in Wichita remained vacant until July of 1997.

63. John Beran did not lose his job in the reorganization, although he was moved into a different region under new management. On his exit interview form, Beran was indicated as a marginal employee as to quantity, and was further indicated as having absenteeism problems.

64. Blue Cross received a copy of plaintiff's first KHRC filing on April 11, 1997.

65. During the investigation of plaintiff's second KHRC complaint, Joy Hill told the KHRC that the Independence office has been closed. That was not true. In her deposition, Ms. Hill testified that she told the KHRC this because she had initially thought the entire office was being eliminated in the reorganization.

66. Both Linda Stanislaus and Sharon Breazeal, the two other employees who lost their jobs in the reorganization, received severance pay. Neither of these individuals was given an opportunity to remain employed by Blue Cross. Neither of them had complained of sex or age discrimination prior to the reorganization. Plaintiff did not receive severance pay. Plaintiff was given an opportunity to remain employed with Blue Cross.

67. Blue Cross did not contest plaintiff's claim for unemployment. The Kansas Department of Human Resources in plaintiff's unemployment proceeding determined that plaintiff "had good cause for refusing an offer of work."

68. Joe DeWerff and Brian Karleskint went to Rita Ortolani's home on Friday, April 18, 1997, and told her that plaintiff's position was being eliminated, and that plaintiff had been offered a transfer to Wichita.

II. *Summary Judgment Standards.*

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

### III. *Discussion.*

Plaintiff contends that Blue Cross's transfer of the ACC account to Brian Karleskint was an adverse employment action made on account of plaintiff's sex or age, in violation of Title VII or the ADEA. Plaintiff also contends that her supervisor, Joe DeWerff, created a hostile work environment on account of her sex and age, and that Blue Cross is liable for his conduct.[2] Plaintiff contends that after she complained of discrimination, Blue Cross unlawfully retaliated against her by denying a request for FMLA leave, by eliminating her position in Independence and then terminating her employment, and by denying her claim for severance benefits. Finally, plaintiff claims that DeWerff and Blue Cross committed the tort of outrage.

In seeking summary judgment, the defendants argue that plaintiff has failed to cite evidence sufficient to support the essential elements of the foregoing claims.

### A. *Age and Sex Discrimination.*

Under the laws of the United States, it is unlawful for an employer to discriminate against an individual with respect to her terms, conditions, or privileges of employment because of such individual's age or sex. *See* 29 U.S.C. § 623; 42 U.S.C. § 2000e–2. In addressing discrimination claims, courts ordinarily use the "burden-shifting" approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), under which the plaintiff must first establish a prima

facie case of employment discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the defendant offers such a reason, the burden then reverts to the plaintiff to show that the defendant's proffered reason was a pretext for discrimination. *Id.* at 804–05, 93 S.Ct. 1817.

 In a Title VII or an ADEA case, the plaintiff establishes a prima facie case by showing the following elements: 1) that she is a member of the class protected by the statute; 2) that she suffered an adverse employment action; 3) that she was qualified for the position at issue; and 4) that she was treated less favorably than others not in the protected class. *Sanchez v. Denver Public Schools,* 164 F.3d 527, 531 (10th Cir.1998). Defendants argue that plaintiff has failed to establish the last three elements of a prima facie case, but the court disagrees. Defendants argue that the reassignment of the ACC account was not an adverse employment action because it was "merely a prospective account" at the time of the reassignment. The court concludes that an employer's reassignment of an account from one salesperson to another, with an accompanying prospect for a significant sales commission, falls within the "terms, conditions and privileges of employment" covered by the federal anti-discrimination laws. Defendants also argue that plaintiff has failed to meet the third element listed above because she has not shown she was more qualified than Brian Karleskint. Such a showing, although relevant on the issue of pretext, is not required as part of the plaintiff's prima facie case. *See Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1510–11 (10th Cir.1997). All that is required here

---

**2.** Plaintiff's Response makes clear that her claims of sex and age discrimination and harassment are not asserted against DeWerff in his personal capacity, but are only asserted against defendant Blue Cross. Pl.Resp. at 16.

is evidence that plaintiff had the qualifications necessary to perform the job. Plaintiff's own testimony, as well as the testimony of Joe DeWerff, are sufficient to make that showing. *Cf. Thomas,* 111 F.3d at 1511. For the same reason, the court rejects defendants' argument as to the fourth prima facie element. The court finds plaintiff has met her burden of establishing a prima facie case with respect to the reassignment of the account.

■ The defendants assert that the ACC account was assigned to Brian Karleskint instead of plaintiff because he had more experience handling this type of account. *See* Karleskint Depo. at 106–07. Because this is a legitimate, non-discriminatory reason, the burden is on the plaintiff to show that this proffered reason was a pretext for unlawful discrimination.

A plaintiff demonstrates pretext by showing either "a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). For example, a plaintiff may demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997). However, a plaintiff's "mere conjecture that [her] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988).

■ Plaintiff offers several reasons why she believes the defendants' stated reason is a pretext. She argues that Carson and DeWerff's deposition testimony shows they were unfamiliar with the candidates' relative experience. That contention, however, is unsupported by the record. The testimony of DeWerff—the supervisor who made the decision—shows that he was familiar with both candidates' experience. *See e.g.,* DeWerff Depo. at 106–08. Plaintiff also suggests that the issue of pretext must be decided by a jury because "[a]t the very least, there remains a question of fact as to which of these two ... contenders was more qualified." Pl.Resp. at 20. That suggestion is unavailing. When an employer articulates a non-discriminatory reason for an employment decision, "it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [decision]." *Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 411 (7th Cir.1997). Thus, the pertinent question is not whether the employer was correct in its assessment, but whether the employer's stated belief was genuine. *Id.* Even if reasonable people could disagree as to which candidate was better qualified, that by itself would not imply that DeWerff's stated opinion was not genuine or was not the basis for his decision. *Cf. Deines v. Texas Dept. of Protective and Regulatory Services,* 164 F.3d 277 (5th Cir.1999) ("the employer's judgment as to qualifications will not be probative of the issue of a discriminatory motive unless the qualifications are so widely disparate that no reasonable employer would have made the same decision.").

■ Plaintiff also argues that DeWerff's stated reason is false, as shown by "the evidence on plaintiff's specific experience on self-funded accounts and the lack of such evidence of Karleskint's experience on such accounts, and the evidence as to the lack of merit as to experience in 'brokered' accounts...." Pl.Resp. at 21. As to the first factor—the candidates' respective experience on self-funded accounts—the

evidence cited is equivocal. In arguing that her experience was superior, plaintiff points out that she had more self-funded accounts at Blue Cross than Karleskint. But this ignores evidence of Karleskint's prior experience in Texas, which included several years of work on self-funded accounts. Karleskint had experience not only in marketing, but also in underwriting large self-funded accounts. He spent one and a half years as an actuary, one and a half years in underwriting, and three years as a marketing representative. As for plaintiff's experience with self-funded accounts, DeWerff testified that he discounted that to some degree because many of plaintiff's accounts had already been sold when she took over the territory, with plaintiff only continuing to service them as opposed to selling them. *See* DeWerff Depo. at 107–08. Plaintiff cites nothing to controvert that assertion, nor does she cite any other evidence to show that DeWerff's explanation was implausible. An employer's choice between similarly qualified candidates is not evidence of pretext. *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1319 (10th Cir.1999). A disparity in qualifications must be "overwhelming" to be evidence of pretext. *Id.* Under the circumstances, the mere fact that plaintiff had more self-funded accounts at Blue Cross than Karleskint does not create a genuine issue of fact.

As for the candidates' relative experience on brokered accounts, which DeWerff cited as a primary reason for his decision, Karleskint clearly had more experience than plaintiff. It is undisputed that the Echlin account would be a "brokered" account in which the sale would be made based on proposals solicited by a national brokerage house acting on Echlin's behalf,

rather than by the representative dealing directly with the employer. It is undisputed that Karleskint had more experience than plaintiff in dealing with brokerage houses and brokered accounts. According to Andrew Corbin's testimony, Karleskint had previously been an actuarial underwriter in the Dallas market and had worked extensively there with agents, brokers and consultants. Pl.Exh. 3 at 31. Karleskint also had a job with Blue Cross and Blue Shield of Texas in which he worked almost exclusively developing proposals for brokerage houses. Karleskint testified that he worked "basically 100 percent" on such accounts while he was in Texas, which was a period of several years. Pl.Exh. 8 at 15. By contrast, plaintiff was responsible for only two brokered accounts.

Plaintiff concedes that Karleskint had more experience in this area, but argues that DeWerff's asserted reliance on it is a pretext because there is no real difference between working on brokered and non-brokered accounts. Plaintiff fails to cite evidence in the record that could support such a finding.[3] Plaintiff points to her own affidavit, which states that "[t]he only difference between a brokered account and one that is not brokered is that on a brokered account a broker solicits the sale and works directly with the proposed group during the solicitation process, while in a non-brokered account the account representative works directly with the group." Pl.Att. 6. This is insufficient to create a fact issue for two reasons. First, the affidavit does not say (as plaintiff appears to assume it does) that prior experience working on brokered accounts has no bearing on a representative's performance on a brokered account.[4] Second, the fact that

3. Plaintiff's brief contains an assertion that a "brokered account means simply that the broker does some of the work so it is in fact less work for the account representative than on a non-brokered account when the representative has to deal with the group." Pl.Resp. at

18. This assertion is not supported by any citation to the record.

4. Plaintiff also cites testimony of Brian Karleskint explaining the difference between a brokered and non-brokered account. Karleskint

plaintiff apparently believes brokerage experience was unimportant, standing alone, would not be sufficient to show that DeWerff's asserted belief to the contrary was a sham. As with the question of who was better qualified, the issue of what qualifications were important centers upon the beliefs of the employer and whether those beliefs were genuine. *Cf. Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 960–61 (4th Cir.1996) (" 'It is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff.") The burden is upon plaintiff to cite evidence showing that it was not credible for Blue Cross to rely upon prior brokerage experience as a qualification for determining which representative should handle this account. Plaintiff's affidavit is simply insufficient to do that. *Cf. Bullington,* 186 F.3d at 1318 (plaintiff's own opinion about her qualifications for the job do not demonstrate a fact dispute about the genuineness of the employer's assessment); *Ost v. West Suburban Travelers Limousine, Inc.,* 88 F.3d 435, 441 (7th Cir.1996) (same).

Echlin's brokerage house informed Blue Cross that it wanted only one representative handling Echlin's account. The plaintiff and Brian Karleskint each had Echlin facilities in their respective territories. Blue Cross essentially had a choice between two employees to be the representative for this account.[5] The evidence suggests that both plaintiff and Karleskint were qualified and effective representatives, but DeWerff testified that he chose

Karleskint because of his experience. Plaintiff has failed to cite evidence from which a jury could reasonably infer that this stated reason was a pretext for age or sex discrimination. Although others might have assessed the qualifications of the candidates differently, the law only prohibits unlawful discrimination; it does not empower a court or jury to second-guess an employer's legitimate business judgment.

**B. *Harassment Based on Age and Sex.***

■■■ Plaintiff next claims that Joe DeWerff, her supervisor, harassed her on account of her sex and age. Title VII and the ADEA may be violated where a supervisor creates an abusive working environment because of an employee's gender or age.[6] *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). For such a "hostile environment" claim to survive a summary judgment motion, " 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Penry v. Federal Home Loan Bank of Topeka,* 155 F.3d 1257, 1264 (10th Cir. 1998). In order to determine whether conduct was sufficiently severe or pervasive enough to be actionable, a court must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

Depo. at 15–16. Nothing in his testimony reasonably implies that experience on brokered accounts was immaterial to handling the Echlin account.

5. Plaintiff points out that it was an unusual for an account located in one representative's territory to be reassigned to a representative in another territory. In view of Echlin's insistence upon a single representative, however, as well as the fact that plaintiff and Karleskint each had Echlin accounts in their respective territories, the fact that such a

reassignment was unusual does not reasonably give rise to an inference of unlawful discrimination.

6. Although the Tenth Circuit has not expressly recognized a "hostile environment" theory under the ADEA, the court concludes that such a claim is viable. *See Crawford v. Medina Gen. Hospital,* 96 F.3d 830, 834 (6th Cir. 1996).

mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The plaintiff must show that the environment was both subjectively and objectively hostile or abusive. *See Davis v. United States Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir.1998).

■ Plaintiff has failed to cite evidence to meet the foregoing standards. As indicated previously, plaintiff's conclusory allegations in the Pretrial Order and KHRC complaint are not sufficient. *See* Fed. R.Civ.P. 56(e). The only specific incidents identified by plaintiff are a few isolated comments by DeWerff, such as a comment about "getting old" and a derogatory reference to "women's hormones." Although such comments might be offensive to a reasonable person, they do not rise to the level of actionable harassment. *See Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir.1994) (isolated incidents of harassment, while inappropriate, do not constitute pervasive conduct). *See also Gonzales v. Western Resources, Inc.*, 36 F.Supp.2d 1289, 1295 (D.Kan.1999) ("The plaintiff cannot simply rely on these few isolated incidents and a general, unsupported allegation of a constant barrage of ... comments ... to support [a] hostile work environment claim."). Nor do the other instances of conflict with DeWerff alluded to by plaintiff in her response (Pp. 23–24) suffice to establish a claim.[7] "Federal law 'does not guarantee a utopian workplace, or even a pleasant one.... [P]ersonality conflicts between employees are not the business of the federal courts.'" *Trujillo v. Univ. Of Colorado Health & Sciences Center*, 157 F.3d 1211, 1214 (10th Cir.1998) (*quoting Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1162

(7th Cir.1994)) In sum, the court concludes the defendants are entitled to judgment as a matter of law on the claims of unlawful harassment.

### C. *Unlawful Retaliation.*

Plaintiff's retaliation claim asserts that Blue Cross engaged in unlawful retaliation by denying her claim for FMLA leave, by eliminating her position in Independence, and by denying her request for severance benefits. Pl.Resp. at 24–29.

■ To establish a prima facie case of retaliation, plaintiff must show: (1) she engaged in protected opposition to Title VII or ADEA discrimination (2) she suffered an adverse employment action contemporaneous with or subsequent to such opposition, and (3) there is a causal connection between the protected activity and the adverse employment action. *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir.1999).

■ The undisputed facts surrounding plaintiff's request for FMLA leave do not reasonably suggest any causal connection between the denial of leave and plaintiff's complaint of discrimination. To support her request for leave, plaintiff submitted a letter to Blue Cross on January 14, 1997, from Allen D. Gillis, D.O., stating simply that plaintiff "needs 2 weeks leave of absence from work due to Acute Anxiety secondary to job stress" and that a follow up visit was scheduled in two weeks for further review. Joy Hill of Blue Cross explained in a letter to plaintiff on January 16, 1997, that her request was being denied because FMLA regulations required "continuing treatment by a health care provider," the definition of which included "a regimen of continuing treatment under the supervision of the ... provider." Hill

---

7. Plaintiff's brief makes several references to a search of her office by DeWerff, although it does not set forth the circumstances of the search. Plaintiff cites nothing to show that the search was done on account of her age or sex.

explained her belief that taking two weeks off from work did not satisfy the requirement of a regimen of continuing treatment. In response, on January 20, 1997, Dr. Gillis informed Hill by fax that plaintiff was currently taking Xanax and Paxil for anxiety and depression due to stress secondary to work-related problems and that plaintiff was also seeing a counselor at Four County Mental Health. After receiving this information, Hill sent revised FMLA papers to plaintiff on January 21, 1997, approving her request for leave. Although it is true that the initial denial of FMLA leave was close in time to plaintiff's discrimination complaint, Joy Hill's explanation and her immediate approval of the FMLA claim upon a proper showing by plaintiff refutes any suggestion that the denial had any connection with the discrimination complaint.

Plaintiff's second alleged incident of retaliation concerns the elimination of her position in Independence. Again, the undisputed facts fail to support a claim. The elimination of this position was part of a major reorganization by Blue Cross. Any suggestion that plaintiff was singled out for inclusion in the restructuring because of her discrimination complaint is refuted by two undisputed facts: first, plaintiff's supervisor, DeWerff, about whom she had complained, recommended that plaintiff be permitted to continue working in the Independence office, but due to legitimate business concerns his recommendation was not adopted; and second, DeWerff was also transferred and had to move to Wichita to keep his position. Like plaintiff, DeWerff was given the option of filling an already existing vacancy in Wichita. These facts overcome

any inference of a causal connection that would otherwise arise from the close proximity of plaintiff's complaint and the transfer of her position. While the court sympathizes with plaintiff on the difficult decision she faced, the company had a right to restructure its work force in accordance with its legitimate business judgment.

Plaintiff also suggests that Blue Cross's decision to terminate her employment was retaliatory. If that was not Blue Cross's intent, she asks rhetorically, "why was the burden placed on her to answer 'now or never' ...?" Pl.Resp. at 28. As an initial matter, requiring an employee to inform her employer if she wants to accept a transfer is not itself an adverse employment action.[8] At any rate, it is undisputed that the elimination of the Independence position was part of a restructuring and that plaintiff could have retained her employment simply by informing DeWerff within the time allotted that she was willing to accept the position in Wichita. Plaintiff cites no evidence that the decision to terminate her employment when she did not accept the offer of continued employment was an act of retaliation or a pretext for unlawful discrimination.

Plaintiff's final claim of retaliation is based on Blue Cross's denial of severance benefits. Plaintiff argues that this refusal was retaliatory because two other employees terminated in the restructuring, both of whom had not complained of discrimination, were granted severance benefits. As Blue Cross points out, however, these other employees had not been offered continued employment with Blue Cross. As such, they were not situated

---

8. Even if it were, plaintiff has not shown that the deadline set by DeWerff was causally related to her complaint of discrimination. Plaintiff complains that DeWerff only gave her one day to decide, but the undisputed facts show that plaintiff knew for several days of the proposed transfer, and that despite DeWerff's attempts to contact her, plaintiff did not return his call for three days. Moreover, plaintiff cites no evidence that the time requirement set by DeWerff was at variance with company practice or policy, or that she was treated differently than other similarly-situated employees.

similarly to plaintiff. Under Blue Cross's benefit plan, severance benefits were not available to an employee who had voluntarily terminated employment. Although plaintiff argues that her decision not to accept the Wichita position was not really voluntary because it would have meant moving from her family home, that argument is unavailing. The fact of the matter is that plaintiff had a choice of continuing employment with Blue Cross. Blue Cross thus had a legitimate basis for concluding that plaintiff had voluntarily terminated her employment and was not eligible for severance benefits. Plaintiff cites nothing to reasonably suggest that Blue Cross's decision was causally related to her complaint of discrimination.

### D. Tort of Outrage.

 Plaintiff contends that Joe DeWerff's conduct constituted the tort of outrage, also known as "intentional infliction of emotional distress". To prove such a claim, a plaintiff must show that (1) the defendant's conduct was intentional or in reckless disregard of the plaintiff, (2) the defendant's conduct was extreme and outrageous, (3) there is a causal connection between the defendant's conduct and the plaintiff's mental distress, and (4) the plaintiff's mental distress is extreme and severe. *Roberts v. Saylor*, 230 Kan. 289, 292, 637 P.2d 1175, 1179 (1981).

 The court finds plaintiff has failed to cite evidence of "extreme and outrageous" conduct on the part of Joe DeWerff. Kansas has set a very high standard for the tort of outrage. *Okoye v. Medicalodge North*, 45 F.Supp.2d 1118, 1125 (D.Kan.1999). Conduct is not extreme and outrageous unless it is regarded as being "beyond the bounds of decency and utterly intolerable in a civilized society." *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1264 (10th Cir.1998) (*citing Moore v. State Bank of Burden*, 240 Kan.

382, 729 P.2d 1205 (1986)). To support her claim, plaintiff cites essentially the same matters alleged in support of her claim for harassment. As with that claim, however, the allegations are not sufficient to withstand summary judgment. *Cf. Roberts v. Saylor*, 230 Kan. 289, 637 P.2d 1175, 1179 (1981) (mere insults, indignities, or petty expressions do not rise to the level of outrageous conduct). DeWerff's isolated comments and the circumstances surrounding plaintiff's termination are insufficient to establish a claim for outrage. "The Kansas courts have been reluctant to extend the outrage cause of action to discrimination and harassment claims; ..." *Bolden v. PRC, Inc.*, 43 F.3d 545, 554 (10th Cir.1994). The court concludes the defendants are entitled to judgment as a matter of law on the claim for outrage.

### IV. Conclusion.

For the foregoing reasons, the defendants' motion for summary judgment (Doc. 39) is GRANTED. The clerk is directed to enter a judgment of dismissal in favor of the defendants and against the plaintiff. IT IS SO ORDERED this 29th day of October, 1999, at Wichita, Ks.